IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY MCCLEARY, | CASE NO. 1:15-cv-00172-JEJ-GBC |
| Plaintiff, | (JUDGE JONES) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 9, 10, 12, 14, 15 |

## REPORT AND RECOMMENDATION

### I.    Procedural Background

On July 13, 2009, Timothy McCleary ("Plaintiff") filed as a claimant for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of September 30, 2014,[1] with an amended disability onset date of July 13, 2009.   (Administrative Transcript (hereinafter, "Tr."), 540-41).

After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on January 25, 2011.  (Tr. 28-70).

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

On March 18, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 12-27). On April 28, 2011, Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on April 1, 2013. (Tr. 1-5). On May 28, 2013, Plaintiff appealed the decision of the Commissioner of the Social Security Administration denying social security benefits in *McCleary v. Colvin*, 1:13-cv-01434-CCC. In *McCleary v. Colvin*, 1:13-cv-01434-CCC, the Commissioner requested that the case be remanded stipulating that, "[o]n remand, the administrative law judge will update the record; hold a supplemental hearing; issue a new decision; and, in the decision, specifically explain the consideration given to the Veterans Administration's disability rating(s)." *McCleary v. Colvin*, 1:13-cv-01434-CCC, at ECF No. 15. On January 2, 2014, the case was remanded for further proceedings. *McCleary v. Colvin*, 1:13-cv-01434-CCC, at ECF No. 16, 17. On February 7, 2014, the Appeals Counsel remanded the matter (Tr. 641-645) mandating for the ALJ to:

> Further evaluate the claimant's medically determinable impairments in accordance with 20 CFR 404.1520, and in so doing, specifically explain the consideration provided the Veterans Administration disability rating and indicate the weight assigned such opinion evidence.

> If needed, further consider the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in suppot1 of the assessed limitations (20 CFR 404. 1545 and Social Security Ruling 85-16 and 96-8p).

> If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404. 1566). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Tr. 643-44).  On June 13, 2014, the ALJ held another hearing (Tr. 555-600) and on September 30, 2014, the ALJ found that Plaintiff was not disabled within the meaning of the Act (Tr. 537-554).  On January 26, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On April 10, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 9, 10).  In the Answer, Defendant "clarifies that jurisdiction and venue are conferred upon this Court pursuant to 42 U.S.C. § 405(g) of the Social Security Act." (Doc. 9).  On May 25, 2015, Plaintiff filed a brief in support of the appeal.  (Doc. 12 ("Pl. Brief")).  On June 25, 2015, Defendant filed a brief in response.  (Doc. 14 ("Def. Brief")).  On June 29, 2015, the Court referred this case to the undersigned Magistrate Judge.  On July 2, 2015, Plaintiff filed a reply brief.

(Tr. 15 ("Reply")).

## II.    Relevant Facts in the Record

Plaintiff was born in May 1982, and thus was classified by the regulations as a younger person through the date of last insured, December 31, 2013.  (Tr. 22); 20 C.F.R. § 404.1563(c).  Plaintiff took special education classes and graduated high school in 2002.  (Tr. 133).  Plaintiff had an Individualized Education Plan ("IEP") for extra time to take tests and for to help with reading and spelling.  (Tr. 134). Plaintiff served in the Army from June 2004 to December 2007.  (Tr. 249). Plaintiff's past relevant work includes a fast food worker, a heat and air conditioning helper and a laborer.  Pl. Brief at 3.  (Tr. 548).

## A. VA Rating Decision[2]

Plaintiff was issued a VA rating decision on August 19, 2012.  (Tr. 1043-44).  The rating decision does not include an explanation or analysis and the following information is generally the entirety of what information was included in the rating decision.  The rating specialist assigned Diagnostic Code 9411 for Plaintiff's PTSD and determined that Plaintiff's PTSD impairment was 50% disabling from December 15, 2007, onward.  (Tr. 1043).  The rating specialist assigned Diagnostic Code 5257 for "chronic lumbar strain (formerly rated as upper and lower back strain)" and determined that the back impairment was: 1) 10%

---

[2] For a detailed explanation of VA disability determinations and terminology, see discussion below.

disabling from December 15, 2007, to April 19, 2009; 40% disabling from April 20, 2009 to March 31, 2010, and; 20% disabling from April 1, 2010, onward. (Tr. 1043). The rating specialist assigned Diagnostic Code 6260 for Plaintiff's tinnitus and determined that impairment was 10% disabling from December 15, 2007, onward. (Tr. 1043). The rating specialist assigned Diagnostic Code 5257 for Plaintiff's "left knee strain with no evidence of chondromalacia patellae (previously diagnosed as right knee strain with chondromalacia patellae)," and determined that the impairment was 0% disabling from December 15, 2007 to April 25, 2010; and 10% disabling from April 26, 2010, onward. (Tr. 1043). A rating specialist assigned Diagnostic Code 5257 for Plaintiff's "right knee strain with no evidence of chondromalacia patellae (previously diagnosed as right knee strain with chondromalacia patellae)," and determined that the impairment was 0% disabling from December 15, 2007 to April 25, 2010; and 10% disabling from April 26, 2010, onward. (Tr. 1044). The rating specialist assigned Diagnostic Code 6100 for Plaintiff's "bilateral hearing loss)," and determined that the impairment was 0% disabling from December 15, 2007, onward. (Tr. 1044). Plaintiff's initial "combined evaluation for compensation"[3] was 60% from December 15, 2007. (Tr. 1044). After submitting successive claims for increased compensation based on purported increase of impairment, Plaintiff had the

---

[3] For an explanation of "combined ratings" see 38 C.F.R. § 4.25 and note 11.

following combined evaluations: 70% from April 20, 2009; 60% from April 1, 2010, and; 70% from April 26, 2010, onward.  (Tr. 1044).  The rating specialist also noted that Plaintiff's claim of sciatic spams of the lower back was not diagnosed and denied Plaintiff's claim for Total Disability Based on Unemployablity ("TDIU").[4]  (Tr. 1044).

### B. Relevant Treatment History, Medical, and Other Source Opinions

**1. VA Treatment Records: Gary T. Budd, Staff Prosthetist, PSAS; James W. Kee, MPT[5]; Morris B. Field, radiologist; Martin P. Fleming, M.d.; Sutton T. Ulman, M.S.W.; Marshall F. Sinback, P.A.-C.; Colleen M. Sluder, D.O.; Cynthia S. Shump, N.P.; Patricia A. Wright, R.N.; David W. Braithwaite, R.N.; Elizabeth L. Putnam, P.A.; Beth E. Nease, P.A.-C.; Anthony K. Rice, M.D.; Denease L. Stec, L.P.N.; Shawn M. Neff, D.C.; Abdolali Elmi, M.D.; Adrienne L. Gray; Deborah D. Willis, R.N.; Mark E. Meany, M.D.; Ali Asghar, M.D.; Manjula Kataram, M.D.; Marsha L. Martin, L.P.N.; Thomas A. Kidd, P.A.; Fezan H. Rizvi, M.D.; Sutton T. Ulman, M.S.W.; Wafa I. Rizk, M.D.; Khusro Y. Arastu, M.D.; Manjula Kataram, M.D.; Joseph Canvin, M.D.; Hojoon Jung, M.D.; Jung Joo Suh, M.D.; Marta J. Chaplynsky, M.D.**

On August 27, 2008, Plaintiff was a new patient with Dr. Sluder and complained of bilateral shoulder pain and bilateral knee pain which was not constant and was not accompanied with weakness.  (Tr. 332-33, 339-40).  Plaintiff reported occasional restriction of motion.  (Tr. 333).  Upon examination, Dr. Sluder observed crepitus in bilateral knees.  (Tr. 334).  Dr. Sluder noted that for a depression screening questionnaire, Plaintiff scored an 18 which suggested

---

[4] See discussion below regarding TDIU disability compensation under VA regulations.  *See* 38 C.F.R. §§ 4.16, 4.17; *Rice v. Shinseki*, 22 Vet. App. 447, 452 (2009).
[5] Master's of Physical Therapy.

moderately severe depression.    (Tr. 334).    Plaintiff reported almost daily experiencing little interest or pleasure in doing things; feeling down, depressed, or hopeless; trouble falling asleep or sleeping too much; feeling tired or with little energy; feeling bad about himself or a failure; trouble concentrating; and, experiencing some difficult taking care of tasks at home or getting along with people. (Tr. 334-35).  Plaintiff reported drinking alcohol monthly or less and no more than two drinks at a time.  (Tr. 340-41).

On September 3, 2008, Plaintiff saw Ms. Nease for an initial evaluation and treatment of depression and anxiety.  (Tr. 331).  Plaintiff reported that he left the military in order to care for his child since his ex-wife wanted a divorce and did not want to keep the child.  (Tr. 331).  Plaintiff added that he missed the military. Plaintiff stated when things weren't going well, he would get depressed.  (Tr. 331). With regards to anxiety, Plaintiff reported that he experiences times when his heart races and he feels fidgety.  (Tr. 331).  Plaintiff reported that he usually avoids crowds and experiences flashbacks, nightmares, and hypervigilance to a degree. (Tr. 331).  Ms. Nease wrote:

> He had been living in Virginia with his girlfriend and they broke up and he moved back to Chambersburg where he has family support. His mother died in May of this year. He was especially close to her . . . . But he has good support system with his one sister. He still doesn't have a job which was a problem in VA.
>
> He has problems going to sleep and staying asleep. I asked about the remeron and he admitted he slept well with it; but thought he slept too

deep and wouldn't know if the house caught on fire. We agreed on benedryl [sic] which he will buy.

Dressed casually and had copies of some of medical history from TN with him. Speech - difficulty finding the right word at times. Thought process linear. Mood slightly anxious but stable. Affect is mood congruent. Denies SI/HI/AVH. Due to time constraints I was not able to complete his mental status which I will do at his next.appt. [sic]

(Tr. 331).  Ms. Nease assessed Plaintiff as having adjustment disorder with anxiety and prescribed Paxil for depression and anxiety.  (Tr. 331).

A letter dated September 10, 2008, indicated that Plaintiff was a "no-show" for a scheduled appointment.  (Tr. 330).

On September 23, 2008, Dr. Fleming reviewed images of Plaintiff's bilateral knees and bilateral shoulders and concluded that the bilateral knees and shoulders were "normal."  (Tr. 229-31).

On September 23, 2008, Plaintiff reported a history of bilateral knee pain with the right knee much worse than the left.  (Tr. 258, 328).  Plaintiff reported that he experienced intermittent left knee pain but has a lot difficulty with the right knee.  (Tr. 258, 328).  Plaintiff reported that while in Afghanistan he had to do "long tracks during a 24 hour period upwards to 12-13 miles."  (Tr. 258, 328). Mr. Sinback noted that Plaintiff did not give "any specific history of acute injury," reporting rather that the pain progressively developed primarily in his right knee while in Afghanistan.  (Tr. 258).  Plaintiff reported that he sought medical attention while in the military and had an MRI scan which was unremarkable.  (Tr. 258).

Plaintiff reported currently working in a warehouse which required frequent squatting and prolonged standing.  (Tr. 258).  Upon physical examination, Mr. Sinback observed that Plaintiff exhibited full extension and flexion of 130 degrees.  (Tr. 259).  Mr. Sinback observed that Plaintiff had a negative McMurray's sign bilaterally and his knees were stable to valgus, varus, and AP stress.  (Tr. 259).  Mr. Sinback further observed that:

> The q angles are normal. He has excellent tracking of his patella with flexion and extension without evidence of subluxation. He has exquisite tenderness in the right retropatellar area including the medial and lateral facets to deep palpation. This is less so on the left side but also he has patellofemoral tenderness there as well. The remainder of the knee exam is unremarkable.
>
> X-rays were taken today which are unremarkable.

(Tr. 259).  Mr. Sinback assessed Plaintiff to have "[p]robable bilateral patellofemoral syndrome right greater than left."  (Tr. 259).  For treatment Mr. Sinback recommended a set of exercises, to continue the use of shoe inserts and to undergo a physical therapy consult to review the exercise program for his knees.  (Tr. 259).  Mr. Sinback opined that Plaintiff's "problem at this time should be considered nonsurgical" and that for pain medication he could "continue the use of NSAIDS" when needed.  (Tr. 259).

On September 26, 2008, a letter was sent to inform Plaintiff that his medical providers have been unable to contact him for follow-up care.  (Tr. 338).

On October 9, 2008, Dr. Field interpreted radiographs taken to investigate

complaints of chronic intermittent bilateral hand pain and right ankle pain.  (Tr. 226-28).  Dr. Field observed no fracture or subluxation.  (Tr. 226-27).  Dr. Field wrote that for the left hand the "interphalangeal joints appear well-maintained. The Carpometacarpal joints appear well-aligned. A small sclerotic area within the capitate is demonstrated. The sclerotic area appears benign and likely represents a bone island.  There is no subcutaneous emphysema or radiopaque foreign body." (Tr. 226-27).  The primary diagnostic code was "minor abnormality" for the left hand.  (Tr. 227).  For the right hand Dr. Field observed that there was "no fracture or subluxation. The interphalangeal joints appear well-maintained. The Carpometacarpal joints appear well-aligned. A small sclerotic area within the capitate is demonstrated. There is no subcutaneous emphysema or radiopaque foreign body.  (Tr. 227-28).  The primary diagnostic code was "normal" for the right hand.  (Tr. 228).

On October 9, 2008, Dr. Field also interpreted images of Plaintiff's right ankle due to complaints of pain.  (Tr. 228).  For the right ankle Dr. Field observed that there was "no fracture or dislocation. The ankle mortise appears well-maintained. There are no sclerotic or lytic lesions demonstrated. There is no subcutaneous emphysema or radiopaque foreign body."  (Tr. 228).  The primary diagnostic code was "normal" for the right ankle.  (Tr. 229).

On October 10, 2008, Plaintiff sought follow-up mental health therapy with Ms. Nease.  (Tr. 294-95).  Ms. Nease observed that Plaintiff was a "somewhat poor historian."  (Tr. 294).  Plaintiff reported that he continued to live with his child, grandparents, his sister, her husband and seven children.  (Tr. 294).  Plaintiff reported that it was easy to be drawn into a verbal confrontation with any of the adults in the household.  (Tr. 294).  Plaintiff reported that he enjoyed his work at a distribution center.  (Tr. 295).  Plaintiff stated that a couple of times he had startled when someone walked up behind him and he told his supervisor about his PTSD and that "he was OK as long as he didn't have a flashback and harm someone."  (Tr. 295).  Plaintiff reported that he was still dealing with his mother's death.  (Tr. 295).  Plaintiff reported that he was having nightmares every night about the same military incident.  (Tr. 295).  Ms. Nease offered Plaintiff prazosin but Plaintiff "refused thinking he has low blood pressure."  (Tr. 295).

Ms. Nease observed that Plaintiff was "[d]ressed casually but out of season. Had on shorts and thin tee shirt."  (Tr. 295).  Ms. Nease observed that Plaintiff had difficulty finding the right word at times, his mood was "slightly anxious but stable," Plaintiff's "[a]ffect is mood congruent," and his memory was intact.  (Tr. 295).  Ms. Nease observed that Plaintiff had the ability to concentrate, had difficulty with abstract thinking, and exhibited fairly good insight and judgment.

(Tr. 295).   Ms. Nease assessed Plaintiff with adjustment disorder with anxiety. (Tr. 295).

On October 24, 2008, Plaintiff saw Ms. Nease for a "walk-in" mental health visit.  (Tr. 291).  Plaintiff stated that his mood was much better and that he was sleeping better.  (Tr. 291).  Plaintiff reported that he talked with his boss at work and they were going to put him on a lesser anxiety ridden type job.  (Tr. 291).  Ms. Nease wrote:

> He was telling me how anxious he feels. I questioned about caffeine: at least 1-2 pots a day along with several bottles of pop. I talked to him about the need to wean off the caffeine slowly. He does not want to do that. I pointed out he was complaining about his anxiousness but then refuses to treat it.

(Tr. 291).  Plaintiff stated that he was out of paxil and Ms. Nease wrote that she told him it had been mailed on October 14, 2008, and he should have received it. (Tr. 291).  Ms. Nease noted that she would submit a new refill.  (Tr. 291).  Ms. Nease observed that Plaintiff's mood was anxious but stable and his affect was "brighter."  (Tr. 291).

On October 30, 2008, Mr. Kee noted that Plaintiff had cancelled two physical therapy sessions and another session was canceled.  (Tr. 252). On December 9, 2008, it was noted that Plaintiff failed to return several calls and that physical therapy would be cancelled until he did a new consultation.  (Tr. 252-288).

On October 31, 2008, Mr. Ulman noted that he was left a message for Plaintiff. (Tr. 288). In a treatment record dated November 7, 2008, Mr. Ulman reviewed Plaintiff records and noted that while serving in the military, he was deployed to Afghanistan between March 2006 and July 2007. (Tr. 249, 285-86). Plaintiff reported that he came under enemy attack and experienced fear for his life and feelings of helplessness. (Tr. 249). Mr. Ulman noted that Plaintiff remained unavailable after multiple calls and messages. (Tr. 249, 285-86).

Letters dated November 20, 2008, stated that Plaintiff missed scheduled appointments. (Tr. 284-85).

On February 27, 2009, Plaintiff sought mental health treatment with Ms. Nease. (Tr. 274-75). Ms. Nease noted that Plaintiff had not been compliant with his medication (specifically Paxil). (Tr. 275). Plaintiff reported experiencing side effects from the medications yet "admit[ed] he didn't take it long enough and didn't refill because he couldn't find the bottle, etc.," to which Ms. Nease suggested that he could have called to get the refill. (Tr. 275). Plaintiff reported that his ex-wife wanted custody of their 7 year old child; however, she would agree to give custody if he promised not to move. (Tr. 275). Plaintiff reported that his work was "going OK," but he was still anxious and stated that he would like to try hydroxyzine. (Tr. 275). Ms. Nease advised that he could not take it for work due to drowsiness and past records indicated that he had taken it before. (Tr. 275).

Ms. Nease indicated that he would take hydroxyzine and discontinue the Paxil. (Tr. 275). Ms. Nease observed that Plaintiff was casually dressed with uncombed hair and that Plaintiff's speech was normal. Ms. Nease noted that Plaintiff's thought process was linear, mood was anxious but otherwise stable, and exhibited no suicidal or homicidal ideation. (Tr. 275).

On February 24, 2009, Plaintiff sought treatment for a viral sinus infection and a migraine that he has had since February 19, 2009. (Tr. 275-76, 279-81). Plaintiff reported that the last time he experienced similar symptoms was three to four years ago. (Tr. 276). Plaintiff reported going to the emergency room on February 22, 2009. (Tr. 276). On February 27, 2009, Plaintiff reported that he felt "75% better" and wanted to return to work on March 2, 2009. (Tr. 278).

On March 6, 2009, Plaintiff sought treatment for his back pain stating that on March 2, 2009, his back started hurting after moving boxes at work. (Tr. 266). Plaintiff went to the emergency room that evening and was treated with toradol and cyclobenzaprine. (Tr. 266). Plaintiff reported that his back is getting better and he has been trying to relax. (Tr. 266). Plaintiff stated that since military service his back has been stiff and he does not have a heating pad. (Tr. 266). Plaintiff requested a letter for his work to not return until March 9, 2009. (Tr. 266-67). Ms. Shump noted that Plaintiff was ambulatory, answered questions freely, and

reported experiencing a level of four out of ten for pain.  (Tr. 267).  Ms. Shump ordered a heating pad to alleviate Plaintiff's back pain symptoms.  (Tr. 267).

On March 25, 2009, Plaintiff reported experiencing back pain and experiencing back spasms earlier in the month.  (Tr. 262).  Plaintiff requested a refill of muscle relaxant medication which he reported worked well and reported using the heating pad with good results.  (Tr. 262).  Dr. Sluder observed "hypertonicity left paraspinal muscles; no vert point tenderness."  (Tr. 263).  Dr. Sluder assessed Plaintiff with back and knee pain and that Plaintiff's PTSD was stable and Plaintiff did not experience suicidal or homicidal ideation.  (Tr. 263).  Dr. Sluder instructed Plaintiff to bend and lift carefully with the knees and to avoid rapid twisting motions.  (Tr. 263).

On March 2, 2009, Plaintiff sought emergency room treatment reporting that he experienced pain in his left lower back going down to his buttocks and rate his pain at a level 8.  (Tr. 271).  Plaintiff explained that he lifts boxes at work all day.  (Tr. 271).  Ms. Putnam observed that Plaintiff had palpable spasms in the left lumbar area, decreased range of motion on flexion and extension and straight leg raise pain at thirty degrees.  (Tr. 272).  Ms. Putnam assessed Plaintiff with low back pain due to spasms, PTSD, anxiety, and migraine headaches.  (Tr. 272).  On March 3, 2009, Mr. Braithwaite noted that Plaintiff met pain relief goal of a pain score of 3 upon discharge.  (Tr. 270-71).

On April 15, 2009, Mr. Budd fitted Plaintiff with an elastic back brace. (Tr. 214-15).  On April 15, 2009, Mr. Kee was consulted to address Plaintiff's reported back pain symptoms. (Tr. 216-220).  Mr. Kee noted that Plaintiff was issued a TENS unit, a lumbar-sacral cushion, and elastic back brace.  (Tr. 216).  Plaintiff reported that the onset of the back pain was the year prior when his job required him to lift seventy pounds.  (Tr. 216-19).  Plaintiff reported that at best, his pain is 5 out of 10, and at worse, it is 9 out of 10.  (Tr. 216-219).  Plaintiff reported that the medication marginally alleviates pain symptoms.   (Tr. 217, 220).  Mr. Kee observed that Plaintiff had a guarded posture, thoracic and lumbar mobility was moderately restricted with some stiffness in the end ranges.  (Tr. 217).  Plaintiff's straight leg raise was positive bilaterally at 35 degrees with mild tightness in hamstrings.  (Tr. 217).  Upon palpation, Plaintiff exhibited "moderate plus" muscle spasm in thoracic area and especially in the lumbar sacral paraspinal area.  (Tr. 217).  Mr. Kee observed that Plaintiff's gait had a "moderate minus antalgic appearance."   (Tr. 217).   Mr. Kee opined that Plaintiff would benefit from rehabilitation for five weeks.  (Tr. 217).

A letter dated April 22, 2009, indicated that Plaintiff missed a schedule appointment.  (Tr. 536).

On June 2, 2009. Ms. Nease noted that:

[Plaintiff] called and wanted his medication refilled. I explained he had refills but had not been taking them. He stated he got depressed

after he lost his job because of his back and "went into a shell."

. . . . [Plaintiff] wanted to know why he didn't have depression as a diagnosis and I told him he had not presented with those symptoms.

(Tr. 524).

On July 9, 2009, Dr. Sluder noted that the day prior Plaintiff requested for a functional work assessment form to be completed for him to return to work, however, by the time she could respond, Plaintiff indicated that he no longer had the job.  (Tr. 522).

On August 24, 2009, Ms. Nease wrote that during a phone conversation Plaintiff stated that:

His new wife left him for the second time the first of August. He states they moved too fast. She left in June and they worked it out and she came back; but now he isn't sure where she is.

He has been drinking and having black out spells. Recently he stated he had been drinking and was in a blackout and beat up his neighbor. He has been arrested.

He is having financial difficulties. He has his own place not living with grandparents. His ex-wife signed custody papers for his daughter.

I asked about why he quit taking medication. His answer was they didn't work. I explained he wasn't on them long enough to give them a good trial. He didn't call me with any of the problems.

He is unable or unwilling to tell me how much he is drinking. I explained if he is having blackout's that's an indication of heavy drinking/tolerance.

He was tearful at times. He denies any SI/HI. He is depressed. He is willing to try some new medication. I stressed to him he has to stay on it long enough for it to work.

(Tr. 519-20).

On September 4, 2009, Plaintiff sought treatment for coughing up blood intermittently for three or four days and stated that he wished to quit smoking. (Tr. 517). Plaintiff reported experiencing a level of 4 out of 10 for pain. (Tr. 517). Ms. Wright noted that Plaintiff had "no functional concerns/needs involving eating, dressing, walking, using a wheelchair or using the bathroom" at the time. (Tr. 518). Plaintiff responded to a questionnaire that he had "never" drank alcohol in the past year. (Tr. 518). Ms. Wright indicated in a suicide assessment that Plaintiff previously attempted suicide by hanging when he was 14-years-old and was currently a medium risk for suicide. (Tr. 516, 19).

On September 4, 2009, Plaintiff sought treatment for a cough which started "about a week and a half ago" and was tinged with blood. (Tr. 513-14). Plaintiff reported experiencing sore throat, wheezing, sinus/nasal congestion, and shortness of breath when climbing stairs and on awakening." (Tr. 514). Plaintiff rated back pain at 4 on the pain scale and stated that he takes Tylenol and naproxen for pain but without much relief. (Tr. 514). Ms. Shump assessed Plaintiff with Bronchitis. (Tr. 515-16). On September 28, 2009, Dr. Sluder noted that after five visits from

"Summit Physical Med & Rehab" the back pain of 3 to 6 out of 10 and the knee pain of 3 out of 10 stayed about the same.  (Tr. 513).

On October 6, 2009, Plaintiff sought follow-up treatment with Ms. Nease (Tr. 512-13).  Ms. Nease noted that Plaintiff had "not been taking his medication as prescribed."  (Tr. 512).  Plaintiff stated when he took 1/2 pill bid he had chest pain and stated that he had palpitations and pain in middle of chest.  (Tr. 512).  Plaintiff reported that he had not been drinking and that he realized he could not drink responsively.  (Tr. 512).  Plaintiff discussed his attempts to obtain a divorce from his estranged wife and "talked about some of his PTSD issues."   (Tr. 512).  Plaintiff reported experiencing nightmares about 4 nights a week, not liking crowds, and that he had been secluding himself in his house most of the time.  (Tr. 512).  Ms. Nease assessed Plaintiff with "PTSD 309.81," "Alcohol Dependence 303.90," and "Non-compliance with treatment V15.81."  (Tr. 512).  Also, in response to what appeared to be "hickies" on his chest, Plaintiff replied that he "was a great lover."  (Tr. 513).

On October 27, 2009, Plaintiff complained of chronic discomfort in neck, hips and legs and reported difficulty in obtaining and marinating an erection over the past two weeks.  (Tr. 497, 501).  Plaintiff reported worsening of symptoms since weather had changed.  (Tr. 497).  Dr. Sluder noted that Plaintiff's CT spine and lumbar X-rays were all normal.  (Tr. 497).  Plaintiff reported experiencing a

pain of 7 out of 10.  (Tr. 499).  Dr. Sluder observed "no vertebral point tenderness; no hypertonic muscles. [Plaintiff] was able to rotate head when speaking to girlfriend or me though stated it hurt to look down."  (Tr. 499).  Dr. Sluder also noted "normal vertebral alignment and no vertebral point tenderness; [Plaintiff] expressed pain on just about every movement of legs."  (Tr. 499).  Dr. Sluder ordered a knee brace to address Plaintiff's knee pain and noted that Plaintiff's erectile dysfunction ("ED") was "likely strong anxiety component, possible med side effect."  (Tr. 499).  Plaintiff reported that he was very pleased with velaxafine regarding mental health symptoms and did not want to switch medication, if possible.  (Tr. 499).  Plaintiff stated that he was acutely ill a couple of weeks ago and feels may his ED was secondary to acute illness.  (Tr. 499).  With regards to PTSD, Dr. Sluder wrote that Plaintiff stated that his symptoms were "very well controlled on venlaxafine and [did] not want to stop this medication."  (Tr. 499).

On November 13, 2009, Plaintiff complained of continued back and knee pain, reporting a level of pain of 8 out of 10 after taking medication.  (Tr. 495-96). Plaintiff returned after two weeks after starting etodolac (an NSAID) and reported no significant improvement after taking the new medication for a few days.  (Tr. 492).  Plaintiff reported that mostly the right knee pain concerned him and that the knee gives out on him.  (Tr. 492).  In response to a questionnaire, Plaintiff reported that although adhering to current treatment plan, the pain interfered with his mood,

sleep, relationships, chores, ability to work, and enjoyment of life. (Tr. 496). Dr.
Sluder advised to continue etodolac and noted that Plaintiff would have a
prosthetics consultation for his knee brace and an orthopedic consultation. (Tr.
493). Dr. Sluder observed that there was no edema, no calf tenderness, no knee
effusions from bilateral knees, no crepitus, and no pain on palpation along the
meniscal lines. (Tr. 492-93). Dr. Sluder noted no vertebral point tenderness, no
muscle spasm appreciated, and no focal, motor or sensory deficits. (Tr. 493).

Although Plaintiff denied illicit drug use and reported minimal alcohol use
(Tr. 492), when Dr. Sluder requested a urine toxicology, Plaintiff responded that
the test would be positive for marijuana. (Tr. 493). Dr. Sluder advised against
drug use and Plaintiff declined a substance abuse referral stating that he was just
having a 'rough day' the prior Monday. (Tr. 493-94). Plaintiff was no longer
using the using treatment to quit smoking and indicated that he was not ready to
quit smoking. (Tr. 494). Dr. Sluder noted that Plaintiff's depression as stable on
current medications. (Tr. 494).

Once to twice a week from November 19, 2009 to December 22, Plaintiff
sought chiropractic treatment for low back pain, neck pain and headaches. (Tr.
481-82, 484, 485). Plaintiff reported that physical therapy temporarily relieved
some of the pain. (Tr. 485). Each time that Plaintiff underwent chiropractic

manipulation, he stated that he felt better after the manipulation. (Tr. 484, 490). Dr. Neff noted pain on palpation and muscle spasms. (Tr. 488).

On December 1, 2009, Plaintiff sought an orthopedic surgery consult with Dr. Elmi. (Tr. 485). Upon examination Dr. Elmi noted that his knee and hip were normal, there was tenderness in the mid-thoracic spine, Plaintiff had a negative SLR, and no radiating symptoms. (Tr. 485). Dr. Elmi noted that the knee X-ray was normal, LS spine normal, thoracic spine showed small upper left thoracic scoliosis, and a questionable compression deformity in D5 or 6 which he would wait for the radiologist's report. (Tr. 485). Dr. Elmi concluded that Plaintiff had a normal knee examination and the bilateral small thoracic scoliosis with "most likely little clinical significance." (Tr. 485). Dr. Elmi also opined that he believed that Plaintiff's "PTSD has a lot to do with his symptoms," and encouraged him to follow up with his PTSD treatments. (Tr. 485).

On December 7, 2009, Plaintiff reported that the venlafaxine wears off by evening and depression symptoms return. (Tr. 483). Plaintiff reported that he spends his day in bed due to back pain. (Tr. 483). Although Ms. Nease wrote "He continues not to drink," Plaintiff was assessed with alcohol dependence. (Tr. 483).

On December 20, 2009, Plaintiff sought ER treatment after falling on ice and injuring his back and also complained of shortness of breath. (Tr. 470-481). Plaintiff reported that his pain was a 10 from a scale of 1-10. (Tr. 480). Plaintiff

had a homicidal plan to go to a "gas station where Middle Easterners are working" and hurt them.  (Tr. 477, 480).  There were no specific problems causing this homicidal feeling.  (Tr. 480).  Plaintiff denied a history of alcohol, denied using street drugs, and denied abusing prescription drugs.  (Tr. 480).  Ms. Gray observed that Plaintiff did not have an impaired gait and did not have any ambulatory aid.  (Tr. 480-81).  Upon examination Plaintiff demonstrated lumbosacral spine tenderness to left paraspinal muscles, some spasm to left, and "negative SLR/CLR/SNT."  (Tr. 472).  Plaintiff could actively dorsiflex and plantarflex.  (Tr. 473).  Plaintiff had "no sensory or motor deficits appreciated. Reflexes [were] 2+ in LEs, Strength [was] 5/5 in LEs."  (Tr. 473).  Plaintiff was diagnosed with "[f]all with exacerbation of chronic low back pain d/t paraspinous muscle spasm," "reactive airway disease, tobacco use disorder," and "sinusitis, odontalgia."  (Tr. 468, 473).  Dr. Chaplynsky interpreted radiographic images of the chest and spine from December 20, 2009, and concluded that Plaintiff's chest was normal; there was no evidence of fracture of malalignment, with normal disc spaces, and "unremarkable" soft tissues.  (Tr. 392-94).

On December 29, 2009, Plaintiff reported injuring himself after falling on some ice on December 20, 2009.  (Tr. 460. 464).

On January 13, 2010, Plaintiff sought emergency treatment to address his anxiety due to "domestic issues with fiancé."  (Tr. 450-457).  On January 14, 2010,

Dr. Asghar noted that Plaintiff's alcohol dependence had been in remission since August.   (Tr. 445).   Plaintiff reported that he had been taking his medications regularly and that the medication is not effective in controlling his anxiety and still experiences nightmares and flashbacks.   (Tr. 445).   Plaintiff reported that he currently lived with a friend.  (Tr. 445).  Dr. Asghar opined that Plaintiff's memory was intact and judgement was fair.  (Tr. 445).   Dr. Asghar assessed Plaintiff with a GAF score of 58.[6]  (Tr. 445).

A pulmonary diagnostic study report dated January 21, 2010, revealed normal findings.   (Tr. 922-23).   Spirometry was normal, there was no acute response to inhaled bronchodilators, flow volume loop was normal, and "volume time curve demonstrated good reproducibility indications good patient effort."  (Tr. 923).

---

[6] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. . . . . A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*").

In a treatment record dated March 23, 2010, it was noted that Plaintiff requested a medication refill and that previous time he had seen Ms. Nease was December 8, 2009.  (Tr. 419).  In a noted dated May 4, 2010, Ms. Nease noted that Plaintiff again cancelled a mental health appointment and stated that he had been seeing psychiatrists and getting medication at another VA location.  (Tr. 419).  Ms. Nease informed Plaintiff of the importance of having just one metal health provider.  (Tr. 419).

On May 15, 2010, Mr. Budd, the staff prosthetist noted that Plaintiff was wearing the knee braces backwards and ruined the hinges.  (Tr. 413).  On May 18, 2010, and May 26, 2010, Plaintiff underwent an MRI of the bilateral knees for compensation purposes.  (Tr. 390-92).  Dr. Suh concluded that the left knee was normal and Dr. Jung concluded the MRI of the right knee was "unremarkable." (Tr. 391).

On June 5, 2010, Plaintiff called requesting an extension of physical therapy services and Mr. Kee wrote that due to Plaintiff's non-compliance, he would not recommend any further treatment sessions.  (Tr. 523-24).

On October 1, 2010, Plaintiff sought follow-up treatment for PTSD and it was noted that he was last seen on January 14, 2010, and that his girlfriend reported that he took his medication irregularly.  (Tr. 398).  Plaintiff reported that his last use of alcohol was in July and the last time he got drunk was in February

2010.  (Tr. 398).   Plaintiff reported that he had been taking his medication regularly and denied using drugs or alcohol at the time.  (Tr. 398-99).  Dr. Asghar observed that Plaintiff's memory was intact, judgement was fair, and assessed Plaintiff with a GAF score of 58.  (Tr. 399).

On August 24, 2010, Plaintiff reported that he was in the process of losing his housing and it was noted that Plaintiff applied for 100% compensation due to unemployability (TDIU).  (Tr. 404).

On June 20, 2011, sought emergency room treatment for right shoulder pain, slight chest pain, black out spells where he does not pass out, and headaches.  (Tr. 918-919).  Plaintiff reported that he does not lose consciousness, however, it "goes black" and his wife catches him and Plaintiff is aware that it is happening.  (Tr. 913).  Plaintiff reported that these episodes last for seconds and recalled that he had seizure as a child due to low iron.  (Tr. 913).  Plaintiff denied alcohol or drug use.  (Tr. 913).  Ms. Willis observed that Plaintiff was ambulatory and able to move all extremities.  (Tr. 919).  Plaintiff reported experiencing pain of a level 4 out of 10.  (Tr. 914-15).  Dr. Meany observed that Plaintiff's gait was "ok" and Plaintiff was ambulatory, the back had no costovertebral angle tenderness or point tenderness (Tr. 915).  Dr. Meany observed normal bilateral reflexes for upper and lower extremities, and the right shoulder had no crepitus and ROM was within normal limits.  (Tr. 916).  Dr. Meany assessed Plaintiff with chest pain, right shoulder

pain, and anxiety. (Tr. 916).

On June 29, 2011, Plaintiff sought follow-up mental health treatment after a break in treatment since October 1, 2010. (Tr. 907). Plaintiff reported that he was feeling drowsy on venlafaxine and stopped using it although it helped with his anxiety and depression. (Tr. 907). Plaintiff reported that he continued to experience PTSD symptoms of nightmares and flashbacks, sleeps two to three hours, and denied alcohol or drug use. (Tr. 907). Dr. Asghar opined that Plaintiff's memory was intact, attention was fair, intelligence was average, thoughts were logical, linear, and goal directed, and; judgment was fair. (Tr. 907). Dr. Asghar diagnosed Plaintiff with PTSD, depressive disorder and alcohol dependence in remission. (Tr. 907). Dr. Asghar assessed that Plaintiff was not presently suicidal or homicidal, not acutely psychotic or manic, not intoxicated or under the influence of drugs or alcohol. (Tr. 908). Dr. Asghar opined that Plaintiff was "psychiatrically stable" and assessed him with a GAF score or 58. (Tr. 908). Dr. Asghar reviewed laboratory results, which included a negative drug screen from June 20, 2011. (Tr. 909). Dr. Asghar opined that the use of an atypical antipsychotic agent would be appropriate to address Plaintiff's mood swings and depression. (Tr. 911). Dr. Asghar found Plaintiff to pose a medium risk of suicide. (Tr. 913).

On October 25, 2011, Plaintiff was evaluated by Dr. Manjula. (Tr. 902-

906).  Plaintiff reported experiencing a level 7 pain primarily in his right shoulder and stated that it is off and on pain which he treats with Tylenol.  (Tr. 903-04).  Plaintiff denied experiencing shortness of breath, syncope, and dizziness.  (Tr. 904).  For social history it is noted that Plaintiff drank beer twice a week.  (Tr. 905).  Dr. Manjula observed no tenderness in the spine, no swelling, and that range of motion in the spine was normal.  (Tr. 906).

On November 1, 2011, Plaintiff received hearing aids.  (Tr. 902).  On December 30, 2011, Plaintiff sought emergency room treatment for G.I. pain.  (Tr. 864).  Ms. Martin observed that Plaintiff was ambulatory, did not have an impaired gait, and able to move all extremities.  (Tr. 864-65).  Plaintiff reported that his last alcoholic drink was a month ago and denied any drug abuse.  (Tr. 865).

On March 15, 2012, Plaintiff reported experiencing depression, fatigue, generalized weakness, and low sex drive.  (Tr. 857).  Plaintiff reported that flexeril and ibuprofen were not significantly reducing his pain.  (Tr. 857).  Plaintiff was assessed to be at low risk for suicide.  (Tr. 858).  Mr. Kidd noted that Plaintiff requested the pain medication of tramadol, and it was discussed with Plaintiff that his pain symptoms were likely depression.  (Tr. 861).

On April 18, 2012, Plaintiff had a "telepsychiatry consult" with Dr. Rizvi.  (Tr. 850-56).  Dr. Rizvi noted that Plaintiff was last seen by Dr. Asghar on June 29, 2011 and was diagnosed with PTSD, alcohol dependence, and depression.  (Tr.

851).  Plaintiff reported that the Aripiprazole helped with his mood swings and Hydroxyzine helped for anxiety that he would like to go restart these medications. (Tr. 851).  Plaintiff reported sleeping poorly due to PTSD nightmares and although in the past Trazodone helped with sleep, he felt drowsy the next day.  (Tr. 851). Plaintiff denied using drugs or alcohol at the time of the consultation.  (Tr. 851).

Dr. Rizvi noted that Plaintiff's fiancé was pregnant.  (Tr. 851).  Dr. Rizvi noted that Plaintiff appeared appropriately groomed, his mood went "up and down," and he had an anxious affect.  (Tr. 851).  Dr. Rizvi noted that Plaintiff was alert and oriented to all spheres and his attention was fair.  (Tr. 851).  Dr. Rizvi diagnosed Plaintiff with PTSD with mood swings and assessed Plaintiff with a GAF score of 55.  (Tr. 852).  Dr. Rizvi reviewed laboratory results which included a negative drug screen from Dec. 20 2011.  (Tr. 854).  Dr. Rizvi opined that Plaintiff was "psychiatrically stable."  (Tr. 852).  Dr. Rizvi recommended for another Tele-Psych visit in 3 to 4 Months.  (Tr. 852).

On May 5, 2012, Plaintiff called very upset at the news that his grandmother just passed away and wanted to medication to alleviate his anxiety.  (Tr. 848-50). From a phone conversation Mr. Ulman noted that Plaintiff "sounded essentially stable and coherent . . . with appropriate range of affect that included sobbing, appropriate to the context, and some laughing, also appearing appropriate and in context."  (Tr. 849).  Plaintiff denied feeling suicidal, hopeless, or helpless at the

time, stating ''I'm not suicidal. I can't think straight. I can't help my sisters with making arrangements. I'm at my grandmother's home." (Tr. 849). Plaintiff said that his fiancé could drive him 1 hour to pick up the anti-anxiety medication. (Tr. 849).

On August 3, 2012, Plaintiff sought emergency treatment for severe right should and right lower neck pain. (Tr. 840-843). Dr. Rizk observed that Plaintiff was splinting right arm with elbow flexed against the chest but was observed that he used it to get out of bed. (Tr. 840). Plaintiff could not recall any injury and had been experiencing the pain for the prior two weeks. (Tr. 840). Dr. Rizk observed that "[with] distraction c-spine and both shoulders are normal." (Tr. 842). Dr. Rizk also observed that Plaintiff's gait was normal and that his large joints were not inflamed or tender. (Tr. 842). Dr. Rizk stated that the images of Plaintiff's C-spine and right shoulder were "unremarkable," had the impression of right shoulder bursitis, and continued Plaintiff on ibuprofen and added a Medrol dose pack. (Tr. 842).

On October 9, 2012, Plaintiff sought follow-up treatment for mood swings which are not fully controlled by Abilify, which he reports helps to some extent. (Tr. 835). Plaintiff was last seen on April 18, 2012 by Dr. Rizvi. (Tr. 835). Plaintiff reported that the trazodone helped with falling asleep but did not keep him asleep. (Tr. 835). Plaintiff reported that he regularly takes his medications and has

cut down his caffeine intake to four cups a day and he drinks one beer a month. (Tr. 835). Dr. Arastu observed that Plaintiff was oriented to all spheres, had fair attention, was anxious, and generally unremarkable appearance, thought, and attitude. (Tr. 836). Dr. Arastu assessed Plaintiff with a GAF score of 60. (Tr. 836). A drug screen from March 15, 2012, was negative and it was noted that Plaintiff pain rating was zero out of ten. (Tr. 838).

On February 27, 2013, Plaintiff sought follow-up treatment for chronic lower back and knee pain. (Tr. 828-831). Plaintiff reported experiencing pain at a level of seven out of ten. (Tr. 831). Plaintiff reported that it was painful to walk. (Tr. 830). Dr. Kataram noted that Plaintiff walked with a cane. (Tr. 830). Dr. Kataram observed that there was no right knee swelling, erythema, tenderness, and range of motion flexion and extension was normal. (Tr. 830). Dr. Kataram observed no focal motor or sensory deficits, SLR test was negative and Plaintiff was able to dorsiflex great toes and feet against resistance. (Tr. 830). Dr. Kataram observed no tenderness, swelling, or rigidity in the lumbar spine. (Tr. 830). Dr. Kataram noted that the MRI was normal and assessed Plaintiff with chronic right knee arthralgia and chondromalacia patella. (Tr. 830).

On April 11, 2013, Plaintiff sought consultation for low back and bilateral knee pain which he reported was exacerbated by walking up steps. (Tr. 825). Plaintiff reported to experience intermittent pain and relief with a TENS unit. (Tr.

825).  Dr. Canvin observed:

> Alert male in no acute distress. He arrives 45 minutes late for the examination today. He is walking with a cane, but walks fine without it. He is able to cross legs and bend at the waist to pick an object dropped off the floor. He appears well rested and comfortable. Knee examination is unremarkable. Low back examination show pain in all planes with ROM testing. Motor is 5/5. Reflexes symmetric and normal. No muscle atrophy. Tight heel cords, hamstrings and hip flexors.

(Tr. 827).  Dr. Canvin assessed Plaintiff with a "mild" case of patellofemoral knee pain, and myofascial low back pain.  (Tr. 827).  Dr. Canvin opined:

> No one should be off work due to either of these problems or both of them together. There is nothing worrisome on the examination, and no neurologic deficits found. He needs to plug himself back into life and become more active. To this end I will order him physical therapy. Medications, [NSAID] or Tylenol as needed. He should not be wearing the low back brace and he was told to stop. He was told of the expectation for him to fully participate in therapy and to do the HEP every day.

(Tr. 827).  Dr. Canvin recommended that Plaintiff commence physical therapy and regarding pathophysiology, Plaintiff needed to "start work and be more active." (Tr. 827).

After nearly a year, Plaintiff sought treatment from the VA on March 7, 2014, for abdominal pain that had persisted for three weeks which was diagnosed as a small uncomplicated reducible umbilical hernia.  (Tr. 820-24).  A surgery consultation concluded that surgery for hernia repair was not recommended.  (Tr. 819-820).

In a pain consultation on Plaintiff reported a pain of two on a scale from zero to ten after taking his medication and responded yes for the entire questionnaire regarding whether his pain interfered with his sleep, relationships, work, chores, ability to walk, enjoyment of life, and mood.  (Tr. 941).  Plaintiff reported drinking one to two drinks once a month.  (Tr. 940).

On May 2, 2014, Plaintiff sought follow-up treatment for chronic conditions. (Tr. 935-40).  Plaintiff refused physical therapy and Dr. Kataram advised to avoid prolonged sitting.  (Tr. 937).  Dr. Kataram noted that Plaintiff last saw a mental health professional in May 2013, had not been taking psychiatric medications and had his prescriptions were last filled in February 2013.  (Tr. 937, 939).  Dr. Kataram recommended that Plaintiff continue NSAIDs to alleviate pain.  (Tr. 937).

### 2.  VA Compensation and Pension Examination ("C&P Examination") for Bilateral Knees, October 2008:[7] William E. Dalton, P.A.-C.; Gracia Z. Santos, M.D.

On October 9, 2008, Plaintiff underwent a C&P examination with Mr. Dalton and cosigned by Dr. Santos.  (Tr. 297-308, 1010-1021).  It was noted that Plaintiff served in the Army from June 2004 to December 2007, working as a back

---

[7] Compensations and pension examinations are not for the purposes of treatment.  *See e.g.*, 38 C.F.R. § 60.2 ("Compensation and pension examination means an examination requested by VA's Veterans Benefits Administration to be conducted at a VA health care facility for the purpose of evaluating a veteran's claim"); *Walker v. Shinseki*, No. 12-2367, 2013 WL 4431075, at *4 (Vet. App. Aug. 19, 2013) (upholding decision which distinguished between statements for the purposes of treatment versus statements made during a compensation and pension examination).

hoe operator and heavy equipment operator.  (Tr. 297).  Plaintiff was currently being treating for PTSD and "probable chondromalacia patellae bilateral knees." (Tr. 297).  Plaintiff reported smoking one pack of cigarettes a day, minimal alcohol use, and worked as a receiving clerk at a loading dock.  (Tr. 298).  Plaintiff stated that "because of his bilateral knees pain he must work at a slower pace than is usual for anyone performing the duties of his current occupation."  (Tr.  298).

Plaintiff reported that he first noticed pain in both knees, with the right knee worse than the left, while running as part of training in the fall of 2004.  (Tr. 298). He sought treatment and was given Motrin 800 mg 1 three times a day for pain and did not receive any other treatment and no other evaluation was done and no -x-rays were done.  (Tr. 298).  Plaintiff reported that his knee pain eventually resolved after a couple of weeks.  (Tr. 298).  Plaintiff reported that his knee pains flared up off and on with running for approximately 18 months until he shipped out to Afghanistan in March of 2006.  (Tr. 298).  In April 2007, as he was descending a staircase, his right knee gave out and he fell and his sergeant who was with him caught him and broke his fall.  (Tr. 298).  According to Plaintiff, his right knee hurt for the next four weeks and he experienced intermittent pain the left knee.  (Tr. 298).  He was again treated with Motrin 800 mg and returned to regular duty which he finished nine months later and returned to the US in October 2006.  MRIs and X-rays of his right knee taken around May of 2007 reveled that his right knee was

"within normal limits." (Tr. 298-99).   In 2007 Plaintiff was diagnosed with chondromalacia patella of both knees.  (Tr. 299).  On August 7, 2008, Plaintiff was seen by an orthopedic specialist at the VA and diagnosed with "probable bilateral patellofemoral syndrome right worse than left."  (Tr. 299).

Plaintiff reported that he always has some pain in bilateral knees on a daily basis, and it is usually a 4/10 intensity.  (Tr. 299).  According to Plaintiff, his pain is usually less in the morning and worsens as the day progresses and he has daily flare-ups of increased pain, to 6-7/10 in his knees, sometimes without any precipitating factors and at other times is secondary to performing the duties of his current job.  (Tr. 299).  Rest, applying ice packs, and taking Extra Strength Tylenol alleviate his pain.  (Tr. 299).  Plaintiff also is prescribed 375 mg naproxen twice daily and Plaintiff does not report any side effects from these medications.  (Tr. 299).  Plaintiff uses bilateral orthotic shoe inserts and he "has not been advised to limit his activities."  (Tr. 299).

According to Plaintiff he has moderate limitations in the ability to accomplish chores, shopping, and recreation, and severe limitations in the ability to travel and engage in sports.  (Tr. 299).  Plaintiff reported that because of his bilateral knee pain, he cannot climb stairs or ladders and he cannot do, roofing work, siding work, or general construction work of any type.  (Tr. 299).

Plaintiff also reported sometimes experiencing stiffness and pain in his lower back and bilateral shoulders. (Tr. 300). Plaintiff did not identify any precipitating factors for his complaints of his back and shoulders pain. (Tr. 300). Plaintiff reported that he takes Tylenol to alleviate his back pain and that the problems resolve on their own. (Tr. 300). Plaintiff reports experiencing constant stiffness in his back and that he also gets flare-ups of pain in his lower back about every 2 months that may last as long as a week. (Tr. 300). Plaintiff denied any precipitating factors for the exacerbations in back pain and reported that ice packs and Tylenol alleviate his pain. (Tr. 300).

Plaintiff reported that these back problems do not affect his job other than it slows down his pace of work. (Tr. 300). Plaintiff reported that sometimes his arms and legs go to sleep if he sleeps with his arms flexed. (Tr. 300). Mr. Dalton noted that this was "self limiting and resolves with activity." (Tr. 300). Plaintiff also reported of intermittent stiffness and soreness in his hands and fingers, especially over the MCP joint of the index fingers bilaterally with the right worse than the left. (Tr. 300).

Plaintiff reported that he constantly has hand and finger pain which get worse with weather changes. (Tr. 300). Plaintiff did not report any precipitating factors for his hands pain, except if he does a lot pulling of boxes and handling

boxes at work, which increases pain in his hands, especially the left hand.  (Tr. 300).

Plaintiff also reported experiencing constant pain in the right ankle, for which he takes Tylenol.  (Tr. 300).  Plaintiff reported that the ankle pain does not impair his ability to do his job except for slower pace of work.  (Tr. 300).  Upon examination Mr. Dalton observed:

> Gait is normal. He can heel and toe stand and squat fully without difficulty. Spine: Cervical spine is nontender, with good range of motion, both active and passive, in all directions and without pain complaints. There is tenderness over the thoracolumbar spine area and the paravertebral muscles of this area with guarding of the bilateral paravertebral musculature of the thoracolumbar spine on the right more than the left. Forward flexion is 0-90 degrees, extension 0-30 degrees, right lateral flexion 0-30 degrees, left lateral flexion 0-30 degrees, right rotation 0-30 degrees, left rotation 0-30 degrees. Otherwise spine has full range of motion in all directions with active and passive motion in all directions, and without pain complaints. All four extremities with full range of motion in all directions. Bilateral shoulders with flexion from 0-180 degrees, abduction 0-180 degrees bilaterally, internal rotation 0-90 degrees, external rotation 0-90 degrees bilaterally. Elbow flexion 0-145 degrees bilaterally. Forearm pronation 0-80 degrees bilaterally. Forearm supination 0-85 degrees bilaterally. Wrist dorsiflexion 0-70 degrees, extension wrist palmar flexion 0-80 degrees bilaterally. Wrist ulnar deviation 0-45 degrees, radial deviation 0-20 degrees bilaterally, upper extremities. Knee flexion and extension bilaterally 0-140, extension 140-0. Hip flexion bilaterally is 0-125 degrees.

(Tr. 301).  Mr. Dalton concluded:

> Otherwise all extremities have full range of motion in all directions with active and passive motion in all directions, and without pain complaints. Sensory to light touch intact and equal bilateral upper and lower extremities. Deep tendon reflexes intact and equal bilateral

upper extremities including biceps, triceps, brachioradialis, bilateral 2+/4 and lower extremities, knee jerks, ankle Jerks 2+/4 bilaterally. Laseague's is negative bilateral lower extremities. Waddell's test is negative. There is point tenderness upon palpation of the bilateral hands, especially the MCP joints of the thumbs, right worse than left. Lower extremities: Lachman's test is positive in the right knee. Sensory to light touch and vibration is intact, bilateral upper and lower extremities.

(Tr. 302).  Mr. Dalton reviewed X-ray reports from Dr. Field of Plaintiff's right ankle, and right and left hands.  (Tr. 304-06).  In an addendum dated October 23, 2008, Dr. Santos wrote that "[r]epetitive motion of all joint/spine ROM's as discussed above showed no change in motion."  (Tr. 307).  Regarding diagnoses, Dr. Santos wrote:

1) Chondromalacia patella, both knees with no limitation of motion, symptomatic.
2) Chronic lumbar strain with no limitation of motion.
3) Normal cervical spine exam.
4) Subjective complaint of pain, both shoulders with normal exam and normal x-ray.
5) Subjective complaint of pain, both hands with normal x-rays.
6) Chronic right ankle strain, with no limitation of motion. Additional info on right ankle: No flare-ups, no assistive device, no effect on daily activities or occupation. No walking or standing limitation. Exam: No deformity. No tenderness. Range of motion full with dorsiflexion 0-20 without pain, Plantar flexion 0-45 without pain with no change on repetition.

(Tr. 307).

///

///

///

### 3.  VA Mental Health C&P Examination, October 2008: Vicki D. Verdeyen, Ed.D.

On October 9, 2008, Plaintiff underwent an additional mental health C&P examination with Dr. Verdeyen.  (Tr. 308-328, 877-887).  With regards to educational history Plaintiff reported that he graduated from high school in 2002, has dyslexia, cared about making good grades, and worked hard in order to do well.  (Tr. 309).  Plaintiff reported that he drank alcohol once a week while watching football.  (Tr. 309, 312).  Plaintiff detailed his experience being under combat fire for the first time in June 2006.  (Tr. 309-10).  Plaintiff stated that he felt helpless, hopeless, and scared during the first surprise attack.  (Tr. 310).  Plaintiff recalled several times when he saw injured soldiers returning to base and while he was in Afghanistan, no one died that he knew.  (Tr. 310).  Dr. Verdeyen noted that Plaintiff did not sustain any combat wounds.  (Tr. 311).

Dr. Verdeyen noted that Plaintiff lives with eleven other relatives in the home and Plaintiff said that it was difficult to find a quiet space.  (Tr. 312).  Plaintiff reported that he talks to his friends, but doesn't socialize outside the home.  (Tr. 312).  Plaintiff reported that he spends time with his daughter and interacts with people on the internet.  (Tr. 312).  Plaintiff reported that his leisure activities consist of watching his favorite TV shows.  (Tr. 312).  Dr. Verdeyen noted that Plaintiff had no history of suicide attempts or history of violence.  (Tr. 312).  Dr. Verdeyen wrote that Plaintiff:

has been employed for one month at a K-mart distribution center. He indicated that the work environment suits him because he works by himself in a trailer. He noted that the other day his boss came up behind him and startled him. He turned around and "almost swung at him, but didn't." He doesn't like his job. He stays to himself, except for one person he knows through a friend. His job performance is satisfactory.

(Tr. 312). Dr. Verdeyen noted that in November 2007 and February 2008 Plaintiff received outpatient treatment for "Adjustment Disorder with Anxiety" and PTSD. (Tr. 313). Dr. Verdeyen observed that Plaintiff was cooperative and guarded and had a flat affect. (Tr. 313). Dr. Verdeyen added that Plaintiff "tries to look happy but he feels depressed and angry." (Tr. 313). Dr. Verdeyen observed that Plaintiff was oriented to person, time, and place; had an unremarkable thought process and content; had no delusions; had an average intelligence; and, had insight into understanding that he has a problem. (Tr. 313).

Plaintiff reported that he has a sleep impairment due to nightly combat-related nightmares which interrupt his sleep. (Tr. 313). Plaintiff reported that on average, he sleeps 4 hours a night, although some nights he can sleep through the night and feel rested. (Tr. 313). Dr. Verdeyen noted that Plaintiff does not interpret proverbs appropriately. (Tr. 313). Plaintiff reported that that he experiences panic attacks once a day at work and when in crowds. (Tr. 313). Plaintiff denied having any suicidal or homicidal thoughts. (Tr. 313).

Dr. Verdeyen noted that Plaintiff's impulse control was fair, that he maintained his personal hygiene and did not have any problems with activities of daily living.  (Tr. 314).  Dr. Verdeyen wrote that Plaintiff's immediate and remote memory was normal and recent memory was mildly impaired.  (Tr. 314).  As an illustration of Plaintiff's memory impairment, Plaintiff reported that he forgets what his grandmother told him to do and he uses a calendar for his appointments.  (Tr. 314).  With regards to mental competency Dr. Verdeyen stated that Plaintiff knew the amounts of his monthly bills, prudently handled payments, handled money, paid bills, and was capable of managing his financial affairs.  (Tr. 314).  Dr. Verdeyen assessed Plaintiff with a GAF score of 60.  (Tr. 316).  Dr. Verdeyen stated that while in the military he was treated for Adjustment Disorder and Plaintiff's current diagnosis of PTSD is related to the previous diagnosis of adjustment disorder.  (Tr. 315).  Dr. Verdeyen opined that "[h]owever, PTSD is the only current mental disorder."  (Tr. 316).

Dr. Verdeyen opined that Plaintiff's mental disorder and symptoms did not result in: 1) total occupational and social impairment; 2) deficiencies in judgement, thinking, family relations, work, mood or school; 3) reduced reliability and productivity due.  (Tr. 316). However, Plaintiff's PTSD did result in occasional decrease in work efficiency, intermittent periods of inability to perform occupational tasks, but with generally satisfactory functioning.  (Tr. 327-28).

Dr. Verdeyen opined that Plaintiff experienced "moderately severe" PTSD symptoms daily which cause "significant distress or impairment in social, occupational or other important areas of functioning. (Tr. 325, 327). According to Dr. Verdeyen, Plaintiff's PTSD symptoms:

> affect his family role functioning, his social/interpersonal relationships, and his recreational pursuits. . . . [His] PTSD syptoms [sic] include re-experiencing, avoidance, and hyperarousal. His symptoms of re-experiencing include having recollections that cause him to feel distressed during the day and he has nightmares and sleep disturbance. His symptoms of avoidance cause social isolation and this affects his social and interpersonal relationships. He prefers to be by himself at work and he does not engage in social activities with friends. His symptoms of hyperarousal include irritability and outbursts of anger which have affected his relationships with his family. He tries to control his anger around his daughter, but he reported irritability and anger with other family members in the home.

(Tr. 327). Dr. Verdeyen further opined that Plaintiff's prognosis was "fair," that he felt better on the medications that were prescribed at the Mountain Home VA, and "[e]xternal stressors exacerbate PTSD symptoms and if he is able to feel more financially secure and move into his own home with his daughter, his PTSD symptoms would likely improve." (Tr. 327).

### 4. VA Spine C&P Examination, May 5, 2009: Anthony K. Rice, Jr., M.D.

On May 5, 2009, Dr. Rice completed a C&P examination for Plaintiff's spine. (Tr. 525-536). Dr. Rice noted that the onset of Plaintiff's lower back pain was March 2006. (Tr. 525). Plaintiff reported that he has had increasing pain, more frequent pain since starting current job in September 2008, and unloading

trucks full of boxes which can weigh up to 70lbs.  (Tr. 525).  Plaintiff also reported that he experiences pain radiating to his legs, muscle spasm, and pelvic pain.  (Tr. 525).  Plaintiff reported that treatment with naproxen, topical cooling agents and hot-packs are fairly effective in alleviating his pain symptoms.  (Tr. 526).

Plaintiff also reported experiencing intermittent upper back strain since September 2008 which is much less severe than his lower back pain, however, still interferes with his ability to sleep well.  (Tr. 526).  Plaintiff reported no known history of cervical spine trauma and that the symptoms have gradually worsened in severity and frequency.  (Tr. 526).  Dr. Rice noted that Plaintiff had a history of experiencing fatigue, decreased motion, stiffness, spasms, and pain.  (Tr. 527). Plaintiff reported that the lumbar pain lasts three to seven days and occurs weekly to monthly.  (Tr. 527).  Plaintiff reported that the cervical pain lasts one to two days and occurs one two six days a week, radiating down the spine and into the arms.  (Tr. 527).  Plaintiff reported that severe flare-ups occur lasting one to two days.  (Tr. 527).   According to Plaintiff, prolonged sitting, standing, twisting, lifting aggravates his symptoms.  (Tr. 527).  Plaintiff reports that during flare-ups he is unable to cook for family.  (Tr. 527).  When asked to list each incapacitating episode due to his back condition during the last twelve months, Plaintiff responded once in March 2009 which lasted for five days.  (Tr. 528).  Plaintiff indicated that he could walk more than a quarter of a mile but less than a full mile.

(Tr. 528).  Dr. Rice noted that other significant history included that plaintiff used the lumbar cushion frequently, but the brace sparingly and a "recent L-spine series showed two metallic foreign bodies, ~2rnm and ~4rnm diameter, located in the lower thoracic and sacral regions."  (Tr. 528).   Upon physical examination of Plaintiff's spine, Dr. Rice observed that Plaintiff's posture, head position, gait, and symmetry were all normal.  (Tr. 528).  Dr. Rice noted that Plaintiff did not have any abnormal curvatures of the spine, no spasms, guarding, or weakness.  (Tr. 528).  Dr. Rice noted that Plaintiff had pain with right and left motion.  (Tr. 529).

Dr. Rice noted that Plaintiff had normal motor examination of 5/5 for his elbows, wrists, fingers, hips, knees, and ankles.  (Tr. 530).  Plaintiff's muscle tone was normal and had no evidence of atrophy.  (Tr. 530).   Reflex and sensory examinations revealed that Plaintiff's upper extremities and lower extremities were normal.  (Tr. 530-32).  Cervical range of motion was from 0 to 45 degrees in all directions and there was no objective evidence of pain on active ROM.  (Tr. 532).  Thoraco-Lumbar spine range of motion was 0 to 30 degrees for flexion, including left lateral flexion and right lateral flexion.  (Tr. 532-33).  Range of motion was 0 to 20 degrees for extension, left lateral rotation, and right lateral rotation.  (Tr. 532-33).  Dr. Rice stated that there was objective evidence of pain with action ROM.  (Tr. 533).  Dr. Rice noted that Plaintiff's Lasegue's sign was not positive.  (Tr. 533).  Dr. Rice noted that there was "[n]o objective evidence of pain was seen with

either axial loading of the cervical spine or simulated rotation of the thoracolumbar spine. This makes it less likely that psychological overlay is responsible for the progression of this veteran's lower back pain." (Tr. 533).

Plaintiff reported that he lost six weeks of work within the prior twelve months due to back pain. (Tr. 534). Dr. Rice diagnosed Plaintiff with lower back strain and symptomatic chronic cervical strain, symptomatic. (Tr. 534-35). Dr. Rice opined that the condition had significant effect in Plaintiff's usual occupation due to increased tardiness and absenteeism. (Tr. 534). Dr. Rice noted that Plaintiff's back condition caused problems with lifting and carrying, difficulty reaching, and pain in his current job which required:

> a lot of lifting carrying and throwing boxes (weighing up to 70lbs each) onto conveyor belts in order to get delivery trucks unloaded quickly. [Plaintiff noted that] the rate of progression of his lumbar pain has been accelerated over the past 9mos since he was hired to do this work. About 8 or 9 weeks ago, the level of pain reached a point he could no longer continue the work, he was seen in the . . . VAMC-ER, advised to stay home from work for a few days. When he tried to return to work, his employer required a medical clearance note.

(Tr. 534-35). With regards to activities of daily living, Plaintiff reports that his back condition: 1) severely affects his ability to complete chores, exercise, and engage in recreation; 2) moderately affects his ability to shop and travel; 3) has no to mild effect in his ability to feed, groom, or toilet, and, 4) required that he make frequent stops when driving longer than 30 to 60 minutes. (Tr. 535).

///

**5.  VA Spine C&P Examination, October 2009: Anthony K. Rice, Jr., M.D.**

On October 15, 2009, Plaintiff underwent an additional C&P examination for a claim of "increased functional limitation secondary to chronic lumbar strain." (Tr. 503-511).   Plaintiff reported continued difficulty obtaining work, as well increased limitation in ability to perform ADLS, such as washing dishes and cleaning his home.  (Tr. 503-04).  Plaintiff reported that the character, severity and frequency of pain have remained the same and he had not developed of any new symptoms.  (Tr. 504).  Treatment for this condition Dr. Sluder remained the same, limited to a prescription for Naproxen, "though he admits lately his compliance has not been as good, since he decided 'they don't work.'"  (Tr. 503-04).

Dr. Rice noted that the course of treatment since onset as remained stable and response to treatment has been fair and without any side-effects.  (Tr. 504). Much of Dr. Rice's observations remained the same as those originally made in the examination completed on May 5, 2009.  *Compare* Tr. 525-536 *with* Tr. 503-511. Plaintiff's range of motion had changed since the May 2009 examination with Thoraco-Lumbar spine range of motion was 0 to 50 degrees for flexion, left lateral flexion of 0 to 20 degrees and right lateral flexion of 0 to 15 degrees.  (Tr. 509). Plaintiff's range of motion for extension was 0 to 15, left lateral rotation and right lateral rotation was 0 to 45 degrees.  (Tr. 509).   Dr. Rice stated that there was objective evidence of pain with action ROM and additional limitations after three

repetitions of range of motion.   (Tr. 509).   Plaintiff's range of motion after repetitive motion changed left and right lateral rotation to 0 to 35 degrees.   (Tr. 509).   Dr. Rice again noted that Plaintiff's Lasegue's sign was not positive.   (Tr. 509).

Dr. Rice noted that Plaintiff's "report of pain with simulated rotation and axial loading of cervical spine. . . . may indicate increased likelihood of significant psychosocial component to current complaint of low back pain."   (Tr. 509).   Dr. Rice noted that Plaintiff was "unable to perform adequate heel- and toe- walking, apparently due to exacerbation of pain."   (Tr. 509).

### 6.   Agency Consultative Examination Report, November 9, 2009: Edward J. Yelinek, Ph.D.

On November 9, 2009, Plaintiff underwent a consultative examination with Dr. Yelinek.   (Tr. 344-355).   Plaintiff reported that he was currently separated from his wife and living with two roommates and his child from a previous marriage.   (Tr. 345).   Dr. Yelinek observed that Plaintiff "walked very easily from the waiting room to the evaluation room. There were no noticeable problems with either posture or gait.   (Tr. 345, 347).   Plaintiff reported that during his military deployment, he helped load injured or deceased bodies on helicopters.   (Tr. 346).   Dr. Yelinek wrote:

> He spoke of considerable physical complaints. He said that he has pain in his lower back. "I have sciatic spasms."  He said that he fell in Afghanistan and rolled down a mountain. "A rock broke my fall." He

has said that the pain radiates down both of his legs. He indicated that
he also has pain in his knees.

(Tr. 346).  Plaintiff reported that he last worked as an unloader in receiving at a

distribution for about six months and left because of back pain.  (Tr. 346).  Plaintiff

stated that the manager was afraid he was going to be injured on the job.  (Tr. 346).

Dr. Yelinek wrote:

> Since leaving work, he remains at home. "If I don't have to go
> outside, I'd rather not." If he goes shopping, he goes at night to avoid
> people. Currently, he is receiving VA benefits. He indicated that he is
> suffering from tinnitus. "My hearing loss got worse because I was an
> equipment operator."

(Tr. 346).  Plaintiff reported that he took several medications but Dr. Yelinek noted

that Plaintiff did not know the names of the medications, did not bring a list of the

medicines that he takes, and did not bring the bottles.  (Tr. 346).  Plaintiff reported

that he sees a therapist at the VA Clinic about once every four to six weeks and

"spoke of considerable difficulty with individuals in his family."   (Tr. 346).

Plaintiff admitted to smoking one pack of cigarettes per day and denied the use of

alcohol or illegal substances.  (Tr. 347).  Dr. Yelinek observed:

> His mood appears depressed. His affect appears constricted and
> extremely anxious. [Plaintiff] pumped his foot constantly during the
> entire evaluation. He also startled extremely easily. For example,
> [Plaintiff] noticeably jumped in his seat in the waiting room when
> greeted to begin the evaluation. . . . His sleep varies. He experiences
> sleep onset insomnia and hypersomnia. He spoke of repeated
> nightmares of combat related situations. His appetite is poor. His
> stamina is poor. He tires easily. His interest are poor. He has a small

group of friends with whom he associates, He does not attend a
church regularly. "The pastor comes to see me about once a month."

(Tr. 347).  Dr. Yelinek stated that:

> His fund of information is good. [Plaintiff] indicated that a
> thermometer was used to take temperature. He also said that the sun
> rises in the east. He was able to perform simple arithmetic
> calculations. He said that 5 +4 = 9 and he indicated that 10 − 6 = 4. He
> also said that 30/6 = 5.

(Tr. 348).   Dr. Yelinek observed that Plaintiff's "attention and concentration

remain intact. He was able to perform serial 7's rather easily."  (Tr. 348).   Dr.

Yelinek also observed:

> His concept formation appears good. [Plaintiff] appears capable of
> thinking abstractly. He is able to name the way that different objects
> are alike. He said that a piano and a drum are alike because both make
> music, and he also said that an orange and a banana are alike because
> both are fruit.

(Tr. 348).  With regards to intelligence Dr. Yelinek wrote:

> [Plaintiff] is functioning within the range of Average intelligence. He
> said that he completed high school. He did indicate that he received
> learning support while he was in school. "I was dyslexic and not good
> in math." [Plaintiff] did have very noticeable difficulty reading the
> items on the vocabulary subtest of the [Wechsler Adult Intelligence
> Scale - III].

(Tr. 348).  Dr. Yelinek opined that Plaintiff's perceptions remained intact and there

was no evidence for delusions or hallucinations.  (Tr. 348).   Although Plaintiff

reported experiencing past suicidal ideation, "he denied suicide intent," and

"denied current and past homicidal ideation or intent."  (Tr. 348).  Plaintiff "did

speak of poor impulse control" and said that he had beaten up the neighbor because he threatened his vehicle.  (Tr. 348).  Plaintiff reported experiencing flashbacks from his time in Afghanistan. (Tr. 348).  Dr. Yelinek observed that there was "no evidence for obsessions or compulsions," and "no evidence for any unusual fears." (Tr. 348-49).  With regards to Plaintiff's memory, Dr. Yelinek stated that:

> [h]is memory appears adequate. His remote memory appears good. [Plaintiff] spoke about incidents from the past, and I believe he is a reliable historian. He could recall what he ate for his most recent meal. His recent memory appears intact. His immediate memory appears somewhat limited. He could recall five digits in the forward direction and three digits in the reverse direction.

(Tr. 349).   Dr. Yelinek also opined that Plaintiff's "social judgment appears somewhat poor" and reiterated incident of a physical altercation between Plaintiff and his neighbor.   (Tr. 349).   Dr. Yelinek also opined that Plaintiff's "test judgment remains intact" and gave an example where Plaintiff replied that if he found an envelope in the street that was sealed, addressed and had a new stamp on it, he would place it in the mailbox.  (Tr. 349).  Based upon testing, Dr. Yelinek found Plaintiff's Verbal IQ to be 91, Performance IQ to be 94, and Full Scale IQ to be 91.  (Tr. 350).  Dr. Yelinek concluded:

> Thus, [Plaintiff] is functioning within the range of Average intelligence, having earned a Full Scale IQ of 91. This IQ is at the 27th percentile. . . . He is just as capable of involving himself in a situation and then manipulating the situation to a successful conclusion as he is manipulating verbal symbols. [Plaintiff] does show some cognitive difficulties as a result of most likely anxiety. His Working Memory Index is at the 12th percentile, and his Processing

> Speed Index is at the 10th percentile. [Plaintiff], therefore, does show some difficulty with memory. Also, he tends to work somewhat slowly.

(Tr. 351). Dr. Yelinek's diagnostic impression was, posttraumatic stress disorder, "rule out reading disorder," and "rule out mathematics disorder." (Tr. 351). Dr. Yelinek assessed Plaintiff with a GAF score of 45 and opined that his prognosis was poor due the fact that he is "receiving very little therapy" for his mood and anxiety difficulties. (Tr. 351). Dr. Yelinek also opined that Plaintiff was capable of managing funds. (Tr. 351).

Dr. Yelinek submitted an assessment of Plaintiff's capabilities indicating that Plaintiff's ability to understand, remember and carry out instructions was affected by his impairment. (Tr. 353). Dr. Yelinek opined that Plaintiff had a slight restriction in ability to "understand and remember short, simple instructions," and "carry out short, simple instructions." (Tr. 353). Dr. Yelinek opined that Plaintiff had a moderate restriction in ability to "understand and remember detailed instructions," "carry detailed instructions," and "make judgments on simple work-related decisions." (Tr. 353). As support for this assessment, Dr. Yelinek cited Plaintiff's working memory index of 82. (Tr. 353).

Dr. Yelinek opined that Plaintiff's ability to respond appropriately to supervision, co-workers, and pressures in a work setting was affected by his impairment. (Tr. 353). Dr. Yelinek detailed that Plaintiff had a moderate

restriction in his ability to interact appropriately with the public and with supervisors.  (Tr. 353).  Dr. Yelinek also opined that Plaintiff had a marked restriction in his ability to interact appropriately with co-workers, respond appropriately to pressures in a usual work setting, and respond appropriately to changes in a routine work setting.  (Tr. 353).  In support for his opinion, Dr. Yelinek cited to Plaintiff's poor impulse control, how easily he startles, his experience of flashbacks, and his interpersonal avoidance.  (Tr. 353).  Dr. Yelinek did not respond to the questions regarding if Plaintiff's impairments included alcohol or substance abuse.  (Tr. 354).

According to Dr. Yelinek, Plaintiff had a marked restriction in his ability to interact appropriately with co-workers, respond appropriately to pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (Tr. 353).

### 7.  Consultative Examination Report, November 14, 2009: Seth Tuwiner, M.D.

On November 14, 2009, Dr. Tuwiner completed a consultative examination report.  (Tr. 356-364).  Dr. Tuwiner completed a questionnaire regarding the extent of Plaintiff's abilities and opined that Plaintiff could: 1) frequently lift and carry ten pounds and occasionally lift and carry 20 pounds; 2) could cumulatively stand and walk five to six hours within an eight-hour work day; 3) had no limitation in ability to sit; 4) was limited to occasional pushing and pulling using the upper and

lower extremities; 5) could frequently bend, kneel, stoop, crouch, balance, and climb; 6) had no limitation in the ability to handle, finger, feel, see, hear, speak, taste, smell or continence; 7) was occasionally limited in reaching; and, 8) no environmental restrictions.  (Tr. 358-59).

Dr. Tuwiner noted that he reviewed all records, including consultation notes. (Tr. 360).  Dr. Tuwiner noted that Plaintiff has had low back pain for the past three years, bilateral knee pain (right greater than the left) since 2004, right shoulder pain since 2004, had reported experiencing pain radiating to both legs, and that symptoms worsened with bending, stooping, crouching and lifting.  (Tr. 360-61). Dr. Tuwiner noted that all of the X-rays and CT's have been negative, and he has never had electrodiagnostic evaluation.  (Tr. 360-61).

Dr. Tuwiner noted that Plaintiff has had military-related PTSD since 2004 accompanied by depression and vivid dreams.  (Tr. 361).  At the time of the consultative examination Plaintiff was seeing a counselor through the Veterans' Administration.  (Tr. 361).  Dr. Tuwiner noted that Plaintiff has had tinnitus since 2004 and has sensorineural hearing loss. (Tr. 361).  Dr. Tuwiner noted that Plaintiff possibly had left hand carpal tunnel syndrome, but such has not been confirmed by an electrodiagnostic evaluation.  (Tr. 361).

Dr. Tuwiner noted that Plaintiff could do all ADLs, had no impairment with activities of fine motor coordination, could walk five minutes at a time, and drove

without limitation.  (Tr. 362).  Dr. Tuwiner noted that Plaintiff that Plaintiff had an antalgic gait, was able to toe, heel walk and tandem.  (Tr. 362).  Plaintiff's Romberg test was negative, finger-to-nose testing was normal.  (Tr. 362).  Dr. Tuwiner noted that Plaintiff's cervical ROM was normal, Dorsolumbar ROM was limited to forward flexion of 30 degrees, and lateral flexion was normal.  (Tr. 362). Plaintiff's bilateral hip, knee, ankle, shoulder, elbow, wrist, finger, and thumb joint range of motion was normal.  (Tr. 362).  Plaintiff indicated pain in the right knee with hip joint range of motion testing.  (Tr. 362).

Dr. Tuwiner found no crepitus or joint deformity, normal tone and bulk throughout; 5/5 power in both proximal and distal extremities bilaterally; 1+ reflexes bilateral bicep, brachialis, and triceps; 2+ reflexes bilateral patella and ankles; plantar responses are flexor (normal), and; all sensory modalities were intact.  (Tr. 362).  Dr. Tuwiner diagnosed Plaintiff to have: 1) "Lumbosacral sprain and strain versus radiculopathy"; 2) "Knee pain of uncertain clinical significance. This may be due to a soft tissue process"; 3) "Right shoulder pain, differential diagnosis includes bursitis, rotator cuff injury and/or arthritis"; 4) PTSD, and; 5) tinnitus.  (Tr. 362-63).

### 8.   Mental RFC Assessment, December 2, 2009: Roger Fretz, Ph.D.

In a Mental RFC assessment dated December 2, 2009, Dr. Fretz indicated that Plaintiff was not significantly limited in his ability to: 1) remember locations

and work-like procedures; 2) understand and remember very short and si1nple instructions; 3) understand and remember detailed instructions; 4) carry out very short and simple instructions; 5) carry out detailed instructions; 6) maintain attention and concentration for extended periods; 7) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 8) sustain an ordinary routine without special supervision; 9) work in coordination with or proximity to others without being distracted by them; 10) make simple work-related decisions; 11) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 12) ask simple questions or request assistance; 13) accept instructions and respond appropriately to criticism from supervisors; 14) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 15) respond appropriately to changes in the work setting; 16) be aware of normal hazards and take appropriately precautions; 17) travel in unfamiliar places or use public transportation, and; 18) set realistic goals or make plans independently of others. (Tr. 365-66).

Dr. Fretz further opined that Plaintiff had moderate limitations in the ability to interact appropriately with the general public and get along with coworkers or

peers without distracting them or exhibiting behavioral extremes.. (Tr. 366). In support of his findings, Dr. Fretz explained:

> [Plaintiff] alleges disability due to post traumatic stress disorder, tinnitus, back, knee and shoulder problems (bilaterally, for both joints), about a 25% hearing loss and bilat.. The medical evidence establishes a medically determinable impairment of PTSD. He is 27 years old and has completed 12 years of formal education. He hasn't had any hospitalizations because of his mental impairment. [Plaintiff] is capable of self-care/hygiene. He is able to perform ADLs, some restrictions secondary to medical issues. He is involved in treatment. He was cooperative with the CE examiner, manifesting no evidence, as per narrative of severe clinical symptomatology, nor evidence of severe dysfunction. He reports an altercation with his neighbor, revealing poor impulse control. This however appears to be an isolated event, does have friends, no problems with family members. It is reasonable however to take into consideration the social issue in future job search.
>
> [Plaintiff's] basic memory processes are intact. His frustration tolerance is low. He has a history of distractive behavior. His ability to function socially is impaired secondary to his extreme emotional lability. Moreover, he would be able to make simple decisions. He retains the ability to perform repetitive work activities without constant supervision. There are few restrictions in his abilities in regards to understanding and memory, sustaining concentration and persistence and adaptation.
> Based on the evidence of record, [Plaintiff's] statements are found to be partially credible.
>
> The opinion stated within the report received 11/09 provided by Ed. Yelinek Ph.D., an examining source, has been considered. The residual functional capacity assessment is different than the opinions expressed by Ed. Yelinek Ph.D. in the report received 11/09 due to inconsistencies with the totality of the evidence in file. Some of the opinions cited in the report are viewed as an overestimate of the severity of [Plaintiff's] functional restrictions. The examining source statements in the report concerning [Plaintiff's] abilities in the areas of making occupational adjustments, making performance adjustments

and making personal and social adjustments are not consistent with all
of the medical and non-medical evidence in the claims folder. The
psychologist's report appears to contain inconsistencies. Therefore,
the psychologist's opinion in this report is less persuasive. The
psychologist's opinion contrasts sharply with other evidence in the
record, which renders it less persuasive. Therefore, the report
submitted by [Dr. Yelinek] received 11/09, is given appropriate
weight and is partially consistent with this assessment.

[Plaintiff] is able to meet the basic mental demands of competitive
work on a sustained basis despite the limitations resulting from his
impairment.

(Tr. 367-68).  Dr. Fretz also opined that Plaintiff had a medically determinable

impairment of PTSD.  (Tr. 374).  In reviewing whether Plaintiff met the criteria for

Listing 12.06, Dr. Fretz opined that Plaintiff had: 1) a mild limitation in ability to

perform of ADLs and maintain concentration, persistence, or pace; 2) a moderate

limitation in ability to maintain social functioning, and 3) no repeated episodes of

decompensation, each of extended duration.  (Tr. 379).  Dr. Fretz opined that the

evidence did not establish the presence of the "C" criteria for Listing 12.06.  (Tr.

380).

### 9.  VA C&P Examination for Spine, March 17, 2010: Ngoc-Dung Tran, M.D.

On March 17, 2010, Plaintiff underwent a C&P examination with Dr. Tran.

(Tr. 420-30).  During the examination, Plaintiff reported that he was unable to

walk more than a few yards and sometimes has to call for help to get out of bed.

(Tr. 422).  Dr. Tran observed that Plaintiff walked with a "shuffling" and antalgic

gait.  (Tr. 422).  Dr. Tran observed no spasms, atrophy, guarding, tenderness or pain with motion of wither the left or right side of Plaintiff's back.  (Tr. 423).  Dr. Tran indicated that there was no muscle spasm, tenderness, or guarding severe enough to be responsible for an abnormal gait.  (Tr. 423).  Dr. Tran stated that the examination results were not reliable and that he could not complete the range of motion tests upon repetition because Plaintiff stated he could not perform the repetition of the cervical and thoraco-Lumbar spine.  (Tr. 426-27).  Dr. Tran concluded with: "Waddell's strongly positive. Findings are not consistent. Exam results not reliable. Not physiologic" and that the assessment was "mainly from subjective complaints. The objective findings [were] not reliable."  (Tr. 427, 430).

### 10. VA C&P Examination for Joints (Shoulder, Elbow, Wrist, Hip, Knee, Ankle), May 18, 2010: Carolyn C. Gartner, M.D.

On May 18, 2010, Plaintiff underwent a C&P examination for Plaintiff's joints with Ms. Gartner and cosigned by Dr. Santos.  (Tr. 405-412).  Ms. Gartner noted that Plaintiff had been provided with a knee brace.  (Tr. 406).  Ms. Gartner noted that Plaintiff's right knee was currently treated with NSAIDS and the response to treatment was good.  (Tr. 407).  Ms. Gartner noted that Plaintiff reported using the cane and brace "always."  (Tr. 408).  Ms. Gartner wrote that Plaintiff had been to physical therapy in the past for his knees but did not do the exercises and did not remember the exercises.  (Tr. 408).  Ms. Gartner observed

that Plaintiff walked with a normal gait although callus formation on the bilateral first and fifth metatarsophalangeals indicated abnormal weight bearing.  (Tr. 409). Ms. Gartner also noted that contrary to Plaintiffs assertion that his knee was swollen, no swelling was observed, and there was "inconsistent guarding of movement." (Tr. 409).

Ms. Gartner observed that the range of motion of Plaintiff's bilateral knees were normal, however, there was objective evidence of pain upon movement.  (Tr. 410). Ms. Gartner wrote:

> [Plaintiff] was able to move the knee in full ROM but when I asked him to do it specifically the ROM was limited -until I stated to him that I saw him move the knees fully then he could move the knees in Full ROM repeatedly. When walking without braces or cane he favored the [right] knee but this was very inconsistent –he would take a step and then flex the knee slightly to limp but after the step was taken. There is mild atrophy of both Quadriceps noted indicating disuse but strength was adequate bilaterally. He wore a brace on each knee and also lumbar brace with a quad cane when he came into the exam.
>
> Physical Exam of knees was completely normal. The atrophy is explained by using a brace on both knees-causing disuse.

(Tr. 410).  Plaintiff diagnoses included "History of [right] knee strain with no objective evidence of any pathology/No evidence of chondromalacia patella." (Tr. 411).  Ms. Gartner and Dr. Santos concluded that:

> This exam shows no evidence of pathology No loss of range of motion Normal MRI [right] knee/the veteran complains of pain which is inconsistent with the physical findings. He limps in a

physiologically    inconsistent    manner-strongly    suspicious    of
malingering.

(Tr. 412).

## 11. VA Spine Mental Health C&P Examination, November 15, 2011: Vicki D. Verdeyen, Ed.D.

On November 15, 2011, Plaintiff underwent a psychological examination conducted by Dr. Verdeyen for the purposes of determining eligibility for VA benefits.  (Tr. 877-87).  Dr. Verdeyen indicated that she reviewed Plaintiff's VA claim's file which included all VA medical records.  (Tr. 881).  Dr. Verdeyen checked a box indicating that Plaintiff's PTSD resulted in occupational and social impairment with reduced reliability and productivity.  (Tr. 880).  Dr. Verdeyen noted that since the last examination in October 2008, Plaintiff had:

> been married twice since 2008 to different women. Mar 2011 he was married for the third time. He is separated from his wife and he plans to file for divorce. He said there were many problems, she was not faithful and he could not keep his temper under control. He said the problems were not only her fault. He lives with his girlfriend who is pregnant with their child, and her cousin who has three children living with her. . . . He and his girlfriend met through a friend he knew when he was in high school. . . His sister is watching his [ten-year-old child] until he gets things in order. He still has joint legal and primary physical custody of his daughter. He has a good relationship with his daughter's mother. His daughter resides about 15 minutes away from him. He sees her most days of the week.

(Tr. 881-82).   Plaintiff reported that the Wellbutrin and it worked "ok," and described his mood as "a roller coaster, happy/sad/anxious."  (Tr. 883).

Dr. Verdeyen observed that Plaintiff's appearance was normal, and that he was cooperative. (Tr. 883). Plaintiff had an appropriate affect, intact memory, good attention, average intelligence, fair judgment, and fair insight. (Tr. 883). Plaintiff's thought flow was linear, logical, and goal directed. (Tr. 883). Plaintiff reported that he watched movies in his room during the day, and at night he sits in the living room, sleeps a couple of hours a night. (Tr. 883). Plaintiff reported that he has nightmares but he does not remember them, even though his girlfriend told him he was screaming at night and that he "swings" in his sleep and he is afraid he might hurt his girlfriend who is pregnant. (Tr. 883).

Plaintiff reported that he said he had a panic attack the prior day when he was in the car after an appointment at the VA, he was joking, talking and then he had a sharp chest pain and started sweating. (Tr. 883). Plaintiff could not remember when he had a previous panic attack. (Tr. 833). Dr. Verdeyen opined that Plaintiff had good impulse control and noted that recent stressors included needing hearing aids, walking with a cane, and having no place of his own to live. (Tr. 883). Plaintiff reported that in 2009, he was arrested after physical altercation stemming from his neighbor having threatened his child's life. (Tr. 884). Plaintiff later discovered that the neighbor had no intent of hurting his child but rather he was trying to Plaintiff into trouble because Plaintiff slept with his neighbor's girlfriend. (Tr. 884).

Plaintiff reported that his last alcoholic drink was on Veteran's Day, that he usually drinks once a month, and that he can control his drinking.  (Tr. 884). Plaintiff reported a history of marijuana and K-2 use, stating that he had a bad experience after smoking a derivative of K-2 and he never smoked it again.  (Tr. 884).  Plaintiff denied abusing any other drugs.  (Tr. 884).  Dr. Verdeyen PTSD questionnaire opinion was substantively the same the one completed in October 2008.  *Compare* (Tr. 884-887) *with* (Tr. 959-962) (October 2008 evaluation).

### 12. VA Spine Health C&P Examination, December 2011: C. Ramadas Kamath, M.D.; Sanjay Saluja, M.D.

On, November 14, 2011, Dr. Kamath completed a C&P examination for Plaintiff's spine.  (Tr. 887-898).  With regards to flare-up, Plaintiff reported that "on most of the days he has severe pain," and he gets some relief from Flexeril and Ibuprofen.  (Tr. 889).  For initial ROM Plaintiff demonstrated the following: 1) forward flexion of 80 degrees and painful motion begins at 70 degrees where 90 degrees is normal; 2) extension of 20 degrees and painful motion begins at 20 degrees where 30 degrees is normal; 3) right lateral flexion of 30 degrees and painful motion starts at 25 degrees where 30 degrees is normal; 4) left lateral flexion of 20 and painful motion begins at 20 degrees where 30 degrees is normal; 5) right lateral rotation of 25 degrees and painful motion starting at 25 degrees where 30 degrees is normal; 6) left lateral rotation of 20 degrees and painful motion starting at 20 degrees where 30 degrees is normal;  (Tr. 889-890).

Dr. Kamath stated that repetitive-use testing of ROM could not be completed because Plaintiff complained of pain on each movement. (Tr. 890). Of the repetitive motions that could be tested after three repetitions, Dr. Kamath wrote that Plaintiff had forward flexion of 70 degrees, extension of 20 degrees, flexion of 20 degrees, right lateral flexion of 20 degrees, left lateral flexion untested, right lateral rotation of 15 degrees, left lateral rotation untested. (Tr. 890-91). Dr. Kamath noted that Plaintiff has pain less movement upon repetitive motion and his symptoms interfere "with sitting, standing and/or weight-bearing." (Tr. 891). Dr. Kamath noted that there was mild pain on palpation, more on the left than the right. (Tr. 891-92). Dr. Kamath noted that Plaintiff does not have guarding or muscle spasm of the thoracolumbar spine. (Tr. 892).

Dr. Kamath noted that muscle strength for: 1) right hip flexion was 4/5; 2) left hip flexion was 3/5; 3) bilateral knee extension was 5/5; 4) bilateral ankle plantar flexion was 5/5; 5) bilateral ankle dorsiflexion was 4/5; and, 6) bilateral great toe extension was 5/5. (Tr. 892).

Dr. Kamath noted that Plaintiff had minor muscle atrophy of the calf muscles. (Tr. 892-93). For deep tendon reflexes (DTRs), Dr. Kamath noted that Plaintiff's left knee was +1 (hypoactive) and right knee and bilateral ankles were normal. (Tr. 893). For the sensory examination Plaintiff exhibited normal results for bilateral upper thighs, bilateral lower leg/ankle, bilateral foot/toes and the right

thigh/knee.  (Tr. 893).  Plaintiff's left thigh/knee exhibited decreased sensation.  (Tr. 893).  Plaintiff reported that sometimes he experiences numbness on the left side at knee level.  (Tr. 893-94).

Dr. Kamath noted that Plaintiff had a negative straight leg raising test of the right leg and positive for the left.  (Tr. 894).  Dr. Kamath also noted that Plaintiff had constant mild radiculopathy pain to the right lower extremity and constant moderate radiculopathy pain to the left lower extremity.  (Tr. 894).  Dr. Kamath wrote that Plaintiff had mild numbness and paresthesias and/or dysesthesias in the left lower extremity and none in the right.  (Tr. 894).  Dr. Kamath noted that Plaintiff regularly used a cane in his right hand to reduce the weight on his right knee although the left side is more affected than the right.  (Tr. 895-96).  Dr. Kamath indicated that Plaintiff's spinal condition impacts Plaintiff's ability to work and as support stated that Plaintiff had not worked for the past two years and that Plaintiff attributed the unemployment to PTSD, back, and leg pain.  (Tr. 898).  Dr. Kamath concluded that he would prefer to rely on the upcoming radiology report.  (Tr. 898).

In an addendum dated December 30, 2011, Drs. Saluja and Kamath opined that the MRI of Plaintiff's lumbar spine (L1-2, L2-3, L3-4, L4-5, L5-S1) revealed no abnormalities.  (Tr. 898-99).  There was "[n]o evidence of lumbar/LS disc bulge

to cause any symptoms of radiculopathy. Some patients just do not cooperate to brnd [sic] forwards 90 deg. L-S spine is normal."  (Tr. 898).

### 13. Psychiatric Review Technique, January 29, 2014: Michael Suminski, Ph.D.

On January 29, 2014, state-agency psychologist Dr. Suminski opined that there was insufficient evidence to substantiate the presence of a mental impairment.  (Tr. 638).  Dr. Suminski noted that Plaintiff failed to cooperate and the evidence in the file was insufficient to evaluate the claim.  (Tr. 638).

### 14. Chambersburg Hospital: Diane Batt, M.D.; Eric Wells, M.D.; David G. Marx, M.D.; Michael M. Coriale, M.D.

On November 6, 2010, Plaintiff sought emergency room treatment for shoulder pain that he had been experiencing for three days.  (Tr. 795).  Plaintiff complained of some chronic right knee pain but no other acute joint pains.  (Tr. 795).  Dr. Coriale observed that the right shoulder revealed "pain with range of motion and palpation diffusely" and prescribed Tylenol and Codeine.  (Tr. 795).

On February 3, 2011, Plaintiff sought emergency room treatment following a motor vehicle accident where his car was rear-ended.  (Tr. 794).  Plaintiff reported increased neck and back pain.  (Tr. 794).   Dr. Marx observed "soreness in the paraspinal musculatures of the thoracic and lumbar region. Good strength to the upper extremities" and discharged Plaintiff with Tylenol and Codeine.  (Tr. 794).

On June 28, 2011, Plaintiff sought emergency room treatment for exacerbation of back pain. (Tr. 792). Plaintiff reported experiencing spasms earlier in the day and an hour prior he had fell while going down the stairs and landed on his lower back. (Tr. 792). Plaintiff denied experiencing a radiating pain. (Tr. 792). Dr. Wells observed "[m]ild L-spine tenderness. Mild to moderate left paravertebral muscle tenderness is present. Straight leg test is unremarkable. Decreased range of motion secondary to pain. . . . No loss of sensation in legs, 5/5 strength in both legs. Deep tendon reflexes 2+." (Tr. 792). Dr. Wells assessed Plaintiff with acute exacerbation of back pain and prescribed flexeril for the muscle spasm. (Tr. 792).

On September 11, 2012, Plaintiff sought emergency room treatment for a finger laceration caused when he was working on his trailer. (Tr. 789).

On November 28, 2012, Plaintiff sought emergency room treatment for neck pain. (Tr. 787). Plaintiff reported that he was in a motor-vehicle accident in Afghanistan in 2006, rolled down a mountain with an injury to his neck, having neck pain off and on ever since that time. (Tr. 787). Plaintiff reported that sometimes his neck pain will occur with even minimal movement such as twisting his neck and that he has had some associated headaches and occasional dizzy spells, when he walks. (Tr. 787). Plaintiff reported that although he is generally treated by the VA, it is a long drive to get there and he did not want to go down

today.  (Tr. 787).  Dr. Batt concluded that Plaintiff had exacerbation of neck pain and treated him with pain medication.  (Tr. 787).

### III.    Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits.  20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428.  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed.  20 C.F.R. § 404.1520(a)(4).  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a

severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and, (5) whether the claimant's impairment prevents the claimant from doing any other work.   20 C.F.R. §§ 404.1520, 416.920.   Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.   The claimant bears the burden of proof at steps one through four.   *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.   *Id.*   The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.   *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.   *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).   Substantial evidence is a deferential standard of review.   *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).   Substantial evidence "does not mean

a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).   Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.   *Jones*, 364 F.3d at 503.   If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.   *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## IV.   Analysis

### A. Credibility

Plaintiff argues that the ALJ rejected his credibility "without adequate rationale" and that the "ALJ's rejection is completely undercut by his mischaracterization of the medical evidence of record."  Pl. Brief at 33-34.  Rather that citing to evidence in the record, Plaintiff speculates that "pain and psychological symptoms may often exacerbate each other, causing a positive feedback loop in which the pain worsens psychological symptoms which in turn cause the pain to be perceived as more severe."  (Tr. 34).  Plaintiff next argues that

the ALJ erred in drawing an adverse inference from the fact that Plaintiff took his medications irregularly.  (Tr. 34).  Without citing to any evidence in the record, Plaintiff further speculates that his "non-compliance [could] be attributed to [Plaintiff's] lack of insight, as is common in people suffering from psychiatric impairments."  (Tr. 34).  Third, without directing the court to specific evidence in the record that would support the severity of Plaintiff PTSD, Plaintiff argues that the ALJ's inference from Plaintiff's PTSD as stable amounts to error.  (Tr. 34). Lastly, without directing the Court to evidence that any medical professional prescribed or determined a cane was necessary, Plaintiff argues that the ALJ's omission of Plaintiff's use of a cane amounts to error.  (Tr. 34).

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  The credibility finding must be based on a consideration of the entire case record, considering several factors in totality.  SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Weidman v. Colvin*, No. 3:14-CV-0552-MEM-GBC, 2015 WL 6673830, at *24-33 (M.D. Pa. Aug. 7, 2015) *report and recommendation adopted*, No. CV 3:14-552, 2015 WL 5829788 (M.D. Pa. Sept. 30, 2015).  There is a distinction between what an adjudicator must "consider" and what the

adjudicator must explain in the disability determination. *See* SSR 06-03p (explaining that to "consider" means to provide explanation sufficient for a "subsequent reviewer to follow the adjudicator's reasoning"); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (social security regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons' . . . not an exhaustive factor-by-factor analysis").

Plaintiff does not address: 1) the medical evidence; 2) contradictions within the medical record; or, 3) doctors' observation of indicia of malingering[8] on more than one occasion.

---

[8] The DSM–IV–TR explains that:

> [t]he essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs.... Malingering should be strongly suspected if any combination of the following is noted:
>
> 1. Medicolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination)
>
> 2. Marked discrepancy between the person's claimed stress or disability and the objective findings
>
> 3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen
>
> 4. The presence of Antisocial Personality Disorder.

DSM–IV–TR at 739–40.

The ALJ relied on a lack of objective medical evidence to support Plaintiff's claim of disability.  (Tr. 543).  The ALJ discussed in detail the voluminous record of objective medical tests and doctors observations which do not support a finding of disability.   (Tr. 543-45).   The ALJ noted that Dr. Elmi indicated that the claimant did not do the physical therapy exercises and "there is some question regarding [Plaintiff's] compliance in addressing his [knee condition]."  (Tr. 543). The ALJ noted that Dr. Tuwiner stated that all x-rays and CT scans of the low back have been negative and an MRI and x-rays of the knees have been inconclusive. (Tr. 543).  The ALJ also noted that on September 11, 2012, Plaintiff reported that he injured himself while working on his trailer.  (Tr. 543).   The ALJ noted that Plaintiff's sensorineural hearing loss was corrected with hearing aids and his hearing impairment does not interfere with his ability to enjoy television, speak and listen to his treatment providers, and engaged in activities of daily life.  (Tr. 543-44).   The ALJ noted that one of Plaintiff's treating psychologists, Dr. Verdeyen, stated that PTSD was Plaintiff's only current mental disorder.  (Tr. 543).

While Plaintiff speculates that Plaintiff's pain symptoms were due to his psychological symptoms (Tr. 34), Plaintiff fails to direct the Court to evidence where a medical expert had concluded such was the case and Plaintiff fails to address the instances where treating physicians indicated that Plaintiff was

malingering.  The Court notes that on December 1, 2009, Dr. Elmi stated that he believed Plaintiff's "PTSD has a lot to do with his symptoms," however; the totality of the psychiatric medical record does not demonstrate any formal findings or diagnoses to support this conclusion.  *See generally Weidman v. Colvin*, No. 3:14-CV-0552-MEM-GBC, 2015 WL 6673830, at *20-24 (M.D. Pa. Aug. 7, 2015) *report and recommendation adopted*, No. CV 3:14-552, 2015 WL 5829788 (M.D. Pa. Sept. 30, 2015) (discussing relevant social security case-law law regarding psychiatric conditions which manifest in physical symptoms).

The ALJ noted where there was a strong suspicion of malingering.  (Tr. 543).  On May 18, 2010, Ms. Gartner (cosigned by Dr. Santos) noted that there was "inconsistent guarding of movement."  (Tr. 409).  In addition to Ms. Gartner and Dr. Santos stating a strong suspicion of malingering, Dr. Saluja stated that there was "[n]o evidence of lumbar/LS disc bulge to cause any symptoms of radiculopathy. Some patients just do not cooperate to brnd [sic] forwards 90 deg. L-S spine is normal."  (Tr. 543).  On March 17, 2010, Dr. Tran stated that the examination results were not reliable and that he could not complete the range of motion tests upon repetition because Plaintiff stated he could not perform the repetition of the cervical and thoraco-Lumbar spine.  (Tr. 426-27).  Dr. Tran concluded with: "Waddell's strongly positive. Findings are not consistent. Exam results not reliable. Not physiologic."  (Tr. 427).  On August 3, 2012, Dr. Rizk

observed that Plaintiff was splinting right arm with elbow flexed against the chest but was observed that he used it to get out of bed. (Tr. 840). On, November 14, 2011, Dr. Kamath observed that Plaintiff regularly used a cane in his right hand to reduce the weight on his right knee although Plaintiff reported that the left side is more affected than the right. (Tr. 895-96).

Substantial evidence support the ALJ in finding that Plaintiff's PTSD was stable. The ALJ referenced March to May 2014 medical evidence which demonstrated that Plaintiff's PTSD was stable and that he last saw a mental health professional in May 2013 and had not been taking psychiatric medications and his prescriptions were last filled in February 2013. (Tr. 937, 939).

Plaintiff's argument that the ALJ erred by omitting Plaintiff's use of a non-prescribed cane is without merit. In addition to the abovementioned evidence indicative of malingering or symptom magnification, on February 27, 2013, although Plaintiff walked with a cane, Dr. Kataram found nothing abnormal with Plaintiff's knees. (Tr. 830). On April 11, 2013, Dr. Canvin observed that although Plaintiff was using a cane, he walked "fine without it." (Tr. 827). Dr. Canvin further opined that "[n[o one should be off work due to [Plaintiff's alleged back and knee] problems or both of them together. . . . He needs to plug himself back into life and become more active. . . . He should not be wearing the low back brace and he was told to stop." (Tr. 827). After this confrontation with Dr. Canvin, it

does not appear that Plaintiff sought further treatment from the VA until nearly a year later for an umbilical hernia.  (Tr. 820-24).

Moreover, Plaintiff's argument that the ALJ erred by drawing an adverse inference from Plaintiff's non-compliance with psychiatric treatment is unpersuasive.  Plaintiff fails to direct the Court to any evidence indicating that Plaintiff had significantly impaired judgement, memory, or poor insight which would undermine his ability comply with treatment.  *See Gleason v. Colvin*, No. 3:14-CV-00021-GBC, 2015 WL 4232569, at *24-25 (M.D. Pa. July 13, 2015) (concluding that the evidence demonstrated Plaintiff had impaired judgement).

The ALJ properly considered, in totality, the objective medical evidence, in addition to evidence regarding Plaintiff's activities, and statements and other information provided by treating or examining doctors.  *See* SSR 96-7p.  The ALJ reasonably relied on medical expert opinion which evaluated the medical evidence, and concluded that it did not substantiate Plaintiff's claims.  *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof"); 42 U.S.C.A. § 1382c(a)(3)(H)(i).   Substantial evidence supports the ALJ's credibility determination based on the totality of factors.

## B. VA Disability Rating

Plaintiff argues that the ALJ erred in assigning little weight the VA disability rating.  Pl. Brief at 14, 23-28.  Plaintiff argues that the Third Circuit precedent requires an ALJ to give substantial weight to the VA disability determinations.  Pl. Brief at 24.

Plaintiff was issued a VA rating decision on August 19, 2012.  (Tr. 1043-44).  After submitting successive claims for increased compensation based on purported increase of impairment, the August 2012 rating decision determined that Plaintiff had a combined compensation rating of 70% from April 26, 2010.  (Tr. 1044).  The rating specialist also considered and denied individual "unemployability" compensation.  (Tr. 404, 1044).

The ALJ gave little weight to the VA rating, reasoning that the rating was "not supported by the Department of Veterans Affairs' own records,"  and that the Department of Veterans Affairs "uses criteria in determining disability that are different from the criteria used by the Social Security Administration."  (Tr. 547).  The ALJ noted that Dr. Jung Suh, an examining radiologist, determined that an x-ray of the claimant's left knee was normal.  (Tr. 547), that Dr. Chaplynsky stated that an x-ray of the lumbar spine showed no evidence of fracture or malalignment, and that Dr. Saluja observed that an MRI of the lumbar spine was normal.  (Tr. 547).

As will be explained below, the Court finds that Third Circuit precedent does not mandate substantial weight to be given to VA disability determinations, the ALJ gave sufficient consideration to Plaintiff's VA disability rating, and the weight accorded to the VA rating is supported by substantial evidence.

### i. VA Disability Compensation

The VA disability rating process is substantively different from the social security disability determinations. *See e.g.*, *Bowyer v. Brown*, 7 Vet. App. 549, 552 (1995) (recognizing that "there are significant differences in the definition of disability under the Social Security and VA systems"); *Hannington v. Sun Life & Health Ins. Co.*, 711 F.3d 226, 233-34 (1st Cir.) *cert. denied*, 134 S. Ct. 285, 187 L. Ed. 2d 152 (2013); *Durden v. Colvin*, No. 1:15-cv-00118-SHR-GBC at ECF No. 21 (M.D. Pa. January 25, 2016). The court in *Fitzgerald v. Astrue* observed:

> The Seventh Circuit explained that attributing "great" weight to a disability determination of the VA "disregards the substantial difference between the criteria used in the [VA and the SSA] programs." *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir.2006). The court further stated that "the Department of Veterans Affairs requires less proof of disability than the Social Security Administration does." *Id.* Moreover, even in circuits which hold that other agency disability determinations are entitled to "great weight," courts still give varying weight to such determinations, "depending upon the factual circumstances of each case." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

*Fitzgerald v. Astrue*, No. CIV.A. 2:08-CV-170, 2009 WL 4571762, at *7 (D. Vt. Nov. 30, 2009). As the First Circuit Court of Appeals observed in *Hannington v. Sun Life & Health Ins. Co.*:

> [S]ervice-connected disability compensation . . . is decidedly different [from to the benefits obtainable under the Social Security Act], and it is the substantive nature of this benefit that must be compared to those under the comparator statutes. . . .
>
> There are very important substantive differences between the Veterans' Benefits Act and the Social Security Act . . . especially between the service-connected disability compensation . . . and the available benefits under the comparator acts. These differences render the Veterans' Benefits Act, as a matter of statutory construction, dissimilar to the Social Security Act . . . .

*Hannington v. Sun Life & Health Ins. Co.*, 711 F.3d 226, 233-34 (1st Cir.) *cert. denied*, 134 S. Ct. 285, 187 L. Ed. 2d 152 (2013). "Congress has created a paternalistic veterans' benefits system to care for those who served their country in uniform. *See, e.g.*, *Comer v. Peake*, 552 F.3d 1362, 1368 (Fed. Cir. 2009); *Hensley v. West*, 212 F.3d 1255, 1262 (Fed. Cir. 2000) (recognizing that the veterans' benefit system is "uniquely pro-claimant")[9]; *Nolen v. Gober*, 222 F.3d 1356, 1361 (Fed.Cir.2000) (pointing out Congress' recognition of the "strongly and uniquely pro-claimant system of awarding benefits to veterans") (citations omitted). The U.S. Supreme recognized that:

---

[9] While the Social Security Act has been described as "unusually protective" of claimants, *Heckler v. Day*, 467 U.S. 104, 106 (1984), the discussion below illustrates how the VA system is significantly more pro-claimant.

> Congress has expressed special solicitude for the veterans' cause. A veteran, after all, has performed an especially important service for the Nation, often at the risk of his or her own life. And Congress has made clear that the VA is not an ordinary agency. Rather, the VA has a statutory duty to help the veteran develop his or her benefits claim.

*Shinseki v. Sanders*, 556 U.S. 396, 412, 129 S. Ct. 1696, 1707, 173 L. Ed. 2d 532 (2009); *see also* H.R. REP. 100-963, 13, 1988 U.S.C.C.A.N. 5782, 5795; *Jaquay v. Principi*, 304 F.3d 1276, 1280 (Fed. Cir. 2002) *overruled on other grounds by Henderson v. Shinseki*, 589 F.3d 1201 (Fed. Cir. 2009) (noting Congress' recognition of the "strongly and uniquely pro-claimant system of awarding benefits to veterans") (citations omitted)).

The VA provides the following types of rating and compensation determinations for "service-connected" disabilities[10]: 1) "schedular;" 2) extra-schedular; and, 3) Total Disability Based on Unemployablity ("TDIU").[11]   There is the baseline schedular rating which is derived from a "schedule of ratings" with diagnostic codes found in 38 C.F.R. Chapter 1, Part 4.  The United States Court of Appeals for Veterans Claims explained that "the rating schedule is based on the 'average impairment in earning capacity caused by a disability,' whereas entitlement to TDIU is based on an individual's particular circumstance."  *Rice v. Shinseki*, 22 Vet. App. 447, 452 (2009) (quoting *Thun v. Peake*, 22 Vet. App. 111,

---

[10] 38 U.S.C.A. § 1501 et seq  governs "non-service connected" disabilities.
[11] There is also "Special Monthly Compensation" ratings for specific impairments. *See* 38 C.F.R. § 3.350; *see also* 38 U.S.C. §§ 1114, 1134.

116 (2008)). A veteran can receive 100 percent disability compensation through ratings as well as through a finding of Total Disability based on Individual Unemployability ("TDIU").  The "rating schedule" is:

> [P]rimarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations. Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability.

38 C.F.R. § 4.1.  Section 4.15 explains:

> The ability to overcome the handicap of disability varies widely among individuals. The rating, however, is based primarily upon . . . *the economic or industrial handicap which must be overcome and not from individual success in overcoming it.*

38 C.F.R. § 4.15 (emphasis added).

The VA rates the degree of a veteran's impairment as categorized by diagnostic codes ("DC") (38 C.F.R. §4.27) that correlate to different impairments and then the degree of impairment severity is assigned a rating ranging from zero to 100 percent, in increments of ten.  38 U.S.C. §§ 1114, 1134, 1155; 38 C.F.R. §§ 38 C.F.R. 3.340, 4.25, 4.31. Different diagnostic codes are allotted maximum available rating percentages that may or may not equal 100 percent for a single

diagnostic code.[12]  Also, a veteran can get different rating percentages for different impairments which are combined for a total rating percentage.  38 C.F.R. § 4.25. [13]

There are five levels of the decision making and appeal process that a veteran can pursue with regards to a rating decision.  *E.g. Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 856-58 (9th Cir. 2011) *opinion vacated on other grounds*, 678 F.3d 1013 (9th Cir. 2012); *VA Adjudication Procedures Manual* (M21–1 Part 3).  The initial rating specialist is called a "Rating Veterans Service Representative" and if a veteran is unsatisfied with the rating percentage determined by the "Rating Veterans Service Representative," the veteran can appeal for a de novo review of law and fact by a senior ratings specialist called a Decision Review Officer ("DRO"), and if still unsatisfied, a veteran can appeal for another de novo review of law and fact before the BVA.  *E.g.* 38 C.F.R. § 20.1507; *VA Adjudication Procedures Manual* (M21–1 Part 3); *Palmquist v. Shinseki*, 689 F.3d 66, 68 (1st Cir. 2012).[14]  The rating specialists and the BVA are "unqualified" to make medical conclusions.  *See e.g.*, *Carr v. McDonald*, No. 14-3204, 2015 WL 7176138, at *4 (Vet. App. Nov. 16, 2015) (finding that the BVA was "unqualified" to make medical conclusions regarding causation of sinus symptoms and whether a

---

[12] For example, the highest rating for burn scars under diagnostic code 7800 is 80%.  38 C.F.R. § 4.118, DC 7800.

[13] For combined ratings "a 50 percent disability and a 30 percent disability" would equal a rating of 70 percent, and "a disability of 40 percent, and another disability of 20 percent" would equal a rating of 50 percent.  *See* 38 C.F.R. § 4.25.

[14] *See* http://www.benefits.va.gov/WARMS/M21_1MR3.asp#d (last accessed January 15, 2016).

veteran's sinus symptoms were chronic); *Ayers v. McDonald*, No. 14-2387, 2015 WL 5881915, at *4-5 (Vet. App. Oct. 8, 2015) (finding that the BVA was not "competent" to make a medical conclusion regarding heart disease); *Kahana v. Shinseki*, 24 Vet. App. 428, 435 (2011); *Colvin v. Derwinski*, 1 Vet. App. 171, 172 (1991); *Moore v. Nicholson*, 21 Vet. App. 211, 218 (2007) *rev'd on other grounds sub nom. Moore v. Shinseki*, 555 F.3d 1369 (Fed. Cir. 2009).[15]   In other words, rating decisions are non-medical "other source" evidence.   *See* 20 C.F.R. §§ 404.1513, 404.1527, 416.913, 416.927; SSR 06-03P; *Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *8 (M.D. Pa. Apr. 10, 2015).

Rating decisions indicate the diagnostic code, the period of time for which the rating determination applies, and often consist of lengthy boilerplate language quoting verbatim from the diagnostic codes and percentage of severity that applies to the veteran's symptoms.   (Tr. 1043-44); *e.g.*, *Lucas v. Astrue*, No. 5:12-CV-131-FL, 2012 WL 6917052, at *9 (E.D.N.C. Dec. 28, 2012) report and recommendation adopted, No. 5:12-CV-131-FL, 2013 WL 239195 (E.D.N.C. Jan. 22, 2013) (doubting the usefulness of the VA rating decision at the initial level, describing it as "essentially a form opinion, unaccompanied by any written report"

---

[15] *See also* 38 C.F.R. §§ 4.2, 4.6 (how an adjudicator evaluates the evidence); *Culver v. McDonald*, No. 14-1458, 2015 WL 1768682, at *2 (Vet. App. Apr. 20, 2015); *Evans v. McDonald*, 27 Vet. App. 180, 188 (2014); *Moore v. Nicholson*, 21 Vet. App. 211, 218 (2007) ("[t]he medical examiner provides a disability evaluation and the rating specialist interprets medical reports in order to match the rating with the disability"), *rev'd on other grounds sub nom. Moore v. Shinseki*, 555 F.3d 1369 (Fed. Cir. 2009); *VA Adjudication Procedures Manual*, M21-1_III_iv_1(c), (d).

and that the "remaining information contained therein concerns the processing and timing of disability payments"); *(Title Redacted by Agency)*, Bd. Vet. App. 1542048 (Sept. 28, 2015); *(Title Redacted by Agency)*, Bd. Vet. App. 1436677 (Aug. 15, 2014).

Fulltime employment does not necessarily contradict a 70% disability rating. *See e.g.*, *Jarrard v. Dep't of Justice*, 669 F.3d 1320, 1321 (Fed. Cir. 2012) (80 percent rating qualifying for federal hiring preference under 5 U.S.C. § 2108(3)(C)); *Spence v. Foxx*, No. CIV. 11-3972 JBS/AMD, 2014 WL 7405207, at *2 (D.N.J. Dec. 30, 2014), appeal dismissed (Mar. 19, 2015); *(Title Redacted by Agency)*, Bd. Vet. App. 1524856 (June 10, 2015) (finding only 70 percent PTSD rating warranted for employed veteran); *(Title Redacted by Agency)*, Bd. Vet. App. 1513531 (Mar. 30, 2015) (granting a veteran 70 percent rating for PTSD while "still employed and [having] a good relationship with his wife and child"); *(Title Redacted by Agency)*, Bd. Vet. App. 1442296 (Sept. 22, 2014) (veteran employed with 70 percent rating for PTSD); *(Title Redacted by Agency)*, Bd. Vet. App. 1440791 (Sept. 12, 2014) (granting a veteran 70 percent rating for PTSD while still gainfully employed); *cf. Rutledge v. Illinois Dep't of Human Servs.*, 785 F.3d 258, 259 (7th Cir. 2015) (noting that "[a] veteran is deemed totally disabled if he suffers from an impairment that would 'render it impossible for the *average* person to

follow a substantially gainful occupation,' even if the veteran applying for benefits is able, through exceptional ability or exertion, to work full time").

In contrast, TDIU "may be assigned" when the veteran has a "scheduler rating less than [100%]," but is "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16, *see Rice v. Shinseki*, 22 Vet. App. 447, 452 (2009). "[V]eterans . . . who are unable to secure and follow a substantially gainful occupation by reason of disabilities which are likely to be permanent shall be rated as permanently and totally disabled." 38 C.F.R. §4.17. Sections 4.16 and 4.17 exclude marginal employment from the definition of substantial gainful occupation using standards such as income level or protected employment in a sheltered workplace. *Id.*

Even with TDIU under 38 C.F.R. § 4.17 and 100 percent schedular ratings, which are often considered most similar to SSA disability regulations, there exist significant differences from SSA disability determination requirements. *See e.g.*, *Eastvold v. Astrue*, No. CIV 03-3054 MJD/RLE, 2010 WL 1286334, at *44 (D. Minn. Feb. 12, 2010) *report and recommendation adopted as modified*, No. CIV 03-3054 MJD/RLE, 2010 WL 1286338 (D. Minn. Mar. 29, 2010) ("While we acknowledge some facial inconsistency, which arises from the VA's finding that an individual is totally disabled, when the same individual is denied Social Security benefits, the basis for different rulings can be explained by the differences

in the underlying Records, and opinions presented, and by different purposes served by the distinctive standards of disability ratings"); *Dean v. Astrue*, No. C08-5112RJB-KLS, 2008 WL 4585328, at *7 (W.D. Wash. Oct. 14, 2008) ("given the difference in the VA's approach to determining entitlement to individual unemployability . . . it is not even clear that a VA rating decision of 100% equates with a finding of disability under the Social Security regulations"). For instance, there are substantive differences in the definition of disability and "unemployability" for VA decisions compared to the Social Security Act and substantive differences between VA disability and Social Security disability regarding the amount of money an individual can still earn and be considered disabled. *Compare* 38 C.F.R. § 4.17(a) (VA definition of total disability based on unemployability) *with* 20 C.F.R. §§ 404.1505, 416.905 (SSA definition of disability for adults); *see e.g.*, *Chubb v. Colvin*, No. 1:14-CV-107-MP-GRJ, 2015 WL 5016832, at *5-7 (N.D. Fla. Apr. 17, 2015) *report and recommendation adopted*, No. 1:14-CV-00107-MP-GRJ, 2015 WL 5016509 (N.D. Fla. Aug. 24, 2015) (discussing differences between TDIU under the VA and disability determinations under the SSA); *Jenkins v. Astrue*, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at *10 n. 26 (N.D. Fla. Feb. 8, 2012) *report and recommendation adopted*, No. 1:11CV23-MP-GRJ, 2012 WL 807263 (N.D. Fla. Mar. 9, 2012). As the court in *Jenkins v. Astrue* observed:

> [U]nder VA disability the fact that a claimant earned up to half of the usual remuneration is not a bar to being disabled so long as the restriction to securing employment relates to the disability. 38 C.F.R. § 4.17(a). In contrast, under the Social Security regulations a person is not disabled if he engages in substantial gainful activity. Substantial gainful activity is defined by dollar limits for each year and are based on a national dollar limit. *See*, 20 C.F.R. § 404.1574. Thus, a claimant who makes less than one half of the claimant's remuneration from a job can be considered disabled by the VA while the amount of the remuneration for Social Security disability purposes could be high enough to constitute substantial gainful activity thus precluding a finding of disability.

*Jenkins v. Astrue*, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at *10 n. 26 (N.D. Fla. Feb. 8, 2012) *report and recommendation adopted*, No. 1:11CV23-MP-GRJ, 2012 WL 807263 (N.D. Fla. Mar. 9, 2012).

## ii.  Evidentiary Requirements

The VA rules for evaluating evidence are distinguishable from the SSA.  For example within the VA, "[w]hen after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability such doubt will be resolved in favor of the claimant." 38 C.F.R. § 4.3.  For VA disability determinations, an adjudicator will consider "competent medical evidence" which means:

> evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. Competent medical evidence may also mean statements conveying sound medical principles found in medical treatises. It would also include statements contained in authoritative writings such as medical and scientific articles and research reports or analyses.

38 C.F.R. § 3.159(a)(1).   According to the Federal Circuit Court of Appeals in

*Parks v. Shinseki*:

> In the case of competent medical evidence, the VA benefits from a presumption that it has properly chosen a person who is qualified to provide a medical opinion in a particular case. Viewed correctly, the presumption is not about the person or a job title; it is about the process.
>
> A presumption exists, of course, to eliminate the burden to produce evidence. As a result, the Veterans Court did not need to examine the dictionary definition of "nurse practitioner" or to require the government to proffer evidence about the qualifications of the medical professional in this case. . . .

*Parks v. Shinseki*, 716 F.3d 581, 585 (Fed. Cir. 2013) *cert. denied*, 134 S. Ct. 2661,

189 L. Ed. 2d 209 (2014) (internal citations omitted).   While the SSA has distinct

requirements and a hierarchy of authority of medical and lay evidence, the VA

generally does not require specific credentials or qualifications for the weight

given for medical opinion evidence for physical impairments.   *Compare* 38 C.F.R.

§ 3.159 *with* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) *and Forster v. Colvin*,

No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *8 (M.D. Pa. Apr. 10, 2015)

(discussing weight accorded to "acceptable medical source" opinions and opinions

from those who are not "acceptable medical sources"); *Bourdreau v. Shinseki*, No.

08-3126, 2010 WL 3119531, at *4 (Vet. App. Aug. 9, 2010) (refusing to address

argument that a vocational specialist's opinion should be allotted more weight

since the court could not make factual determinations in the first instance and that

"competency 'is a legal concept determining whether testimony may be heard and considered by the trier of fact, while [weight and credibility] is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted'").   For example, while SSA regulations consider opinions from a nurse practitioner or physician assistant to be "non-medical opinions" which cannot be the basis to establish a diagnosis and may be accorded less weight, (*Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *8), the same opinions would be considered "competent" within the VA disability determination process.   *See e.g.*, 38 C.F.R. § 3.159(a)(1); *Parks v. Shinseki*, 716 F.3d 581, 585; *Ruiz-Rojas v. Peake*, No. 06-3590, 2008 WL 4414306, at *3 (Vet. App. Sept. 16, 2008) (compensation and pension examination conducted by a nurse practitioner).

While not delineating specific required credentials for mental health opinions rendered by private treatment sources, the VA, however, has requirements regarding qualifications and credentials for C&P opinions rendered for mental health impairments.   *See* VHA Directive 2012-021, "Qualifications For Examiners Performing Compensation And Pension (C&P) Mental Disorder Examinations."[16]

---

[16]The VHA Directive 2012-021(4)(b) specifies the qualifications for mental health professionals to render initial C&P opinions for mental disorders which include, for example, "Non-licensed doctoral-level psychologists working toward licensure under close supervision by a board-certified, or board-eligible, psychiatrist or a licensed doctoral-level psychologist."   VHA Directive 2012-021(4)(b),
http://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=2780 (Last accessed

Even with the requirements articulated in VHA Directive 2012-021, such are not as stringent as those detailed in 20 C.F.R. §§ 404.1513(a), 416.913(a) which are limited to licensed physicians and licensed or certified psychologists.

### iii.  Weight to 70% VA Disability Determination

It is an issue of first impression as to whether an ALJ must allot substantial weight to all VA disability ratings.

The Court notes that in 1969, the Third Circuit Court of Appeals in *Pulaski v. Finch*, addressed the significance of a VA disability determination in a SSA decision where the VA concluded that a veteran qualified as "permanently and totally disabled from non-service connected disability" under a 1964 version of 38 U.S.C. § 521 (which was later amended and recodified to 38 U.S.C. § 1521(a)). *Pulaski v. Finch*, 415 F.2d 613, 613 (3d Cir. 1969); *see also* 38 U.S.C. § 1521(a) (Pub.L. 85-857, Sept. 2, 1958; Pub.L. 88-664, § 6(b), Oct. 13, 1964, 78 Stat. 1095; Pub.L. 90-77); *Block v. Brown*, Vet. App. 1994 (discussing non-service connected total disability under § 1521(a)); *Dilles v. Brown*, Vet. App. 1993 (discussing non-service connected total disability under § 1521(a)).  Given that *Pulaski v. Finch* addressed an issue involving a total disability determination from a statutory scheme that relates to non-service connected disabilities (38 U.S.C. § 1501 et seq.) which has since been amended from the time of decision, the facts and law of this

January 7, 2016).

instant case are distinguishable from *Pulaski v. Finch.*

Additionally, the dicta from *Fowler v. Califano*, citing to *Pulaski* is equally inapplicable to this case. *See Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir. 1979). The court in *Fowler v. Califano* found that a *doctor's opinion from another agency* should be accorded substantial weight, a finding that is readily distinguishable from the issue in this case. Thus the court in *Kane v. Heckler*, citing to *Fowler v. Califano* is equally unpersuasive. *See Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985). The Court also finds the often cited Ninth Circuit case, *McCartey v. Massanari*, unpersuasive. *See McCartey v. Massanari*, 298 F.3d 1072 (9th Cir. 2002). In support of the conclusion that significant weight must be granted to all VA rating decisions, the court in *McCartey v. Massanari* cites to cases which address VA "total" or 100 percent disability (*Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) & (*Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984)) while not making the critical distinction in its case involving an 80 percent VA disability rating, and cited a footnote from *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) regarding giving great weight to a physician's opinion. *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). Moreover, in support of its conclusion that there's "marked similarity between these two federal disability programs" and that "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing

basis," the court in *McCartey v. Massanari* merely cites the entire regulatory section for VA ratings to compare with the entire SSA disability regulatory scheme without any detailed discussion of the differences throughout the various sections between the SSA and VA regulatory schemes. *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (stating "*Compare* 38 C.F.R. § 4.1 et seq. (VA ratings) *with* 20 C.F.R. § 404.1 et seq (Social Security Disability)"). Courts that cite to TDIU cases as support that all VA disability determinations are similar to the SSA and conflate a TDIU under 38 C.F.R. § 4.16 with other less than total disability determinations by the VA, are unpersuasive.

The Court notes that this case does not involve a schedular or non-schedular 100 percent rating (also known as "total" disability rating), a TDIU disability determination, or a finding of non-service connected permanent and total disability under 38 U.S.C. § 1521(a).

Plaintiff also fails to establish that the ALJ's explanation for assigning little weight to the 70% rating was insufficient. While the ALJ's reasoning is brief, it still allows for meaningful judicial review. *See e.g.*, *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir.2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Varano v. Colvin*, No. 3:14-CV-001467-GBC, 2015 WL 5923615, at *9 (M.D. Pa. Oct. 9, 2015). It is reasonable not to require the ALJ

to give a lengthy statutory and regulatory discussion explaining the differences between the VA and SSA disability compensation systems in order to find that substantial evidence supports the ALJ's conclusion that the VA rating of 70 percent warrants little weight given that the standards for determining disability under the VA are significantly different from those of the SSA.

Different types of evidence require different types of explanation. *See e.g.* 20 C.F.R. §404.1527(c). "There is no requirement that the ALJ discuss in [the] opinion every tidbit of evidence included in the record." *Hur v. Comm'r Soc. Sec.*, 94 F. App'x 130, 133 (3d Cir. 2004). The ratings determination is not a medical opinion, because it is not from an acceptable medical source, and is not an opinion from another medical source. *See* SSR 06-3p. While disability determinations from other government agencies are not binding (20 CFR §§ 404.1504, 416.904), they must be considered. SSR 06-03p. By "consider," SSR 06-03P means to provide explanation sufficient for a "subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03P; *see also Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 510 (6th Cir. 2013); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (social security regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons . . . not an exhaustive factor-by-factor analysis"). The Court further notes that "[n]either 20

C.F.R. § 404.1504 nor SSR 06–03p requires that any specific level of weight be accorded a VA disability decision." *Wilson v. Colvin*, No. 2:13-CV-197-JDL, 2014 WL 4715406, at *5 (D. Me. Sept. 22, 2014).

The ALJ explicitly acknowledged and addressed the 70 percent rating. (Tr. 46). The ALJ's consideration was based on valid reasoning. As explained above, the standards for determining disability under the VA are substantively different from those of the SSA. *See e.g.*, *Jenkins v. Astrue*, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at *10-11 (N.D. Fla. Feb. 8, 2012) *report and recommendation adopted*, No. 1:11CV23-MP-GRJ, 2012 WL 807263 (N.D. Fla. Mar. 9, 2012) (finding no error in ALJ determination that the VA's disability determination of "total disability" should be accorded less weight based on the "substantial differences in the criteria used by the VA in making disability evaluations as compared to disability decisions under the Social Security Act"); *Barnett v. Astrue*, No. 3:10-CV-1316, 2012 WL 75046, at *15-18 (S.D.W. Va. Jan. 10, 2012) (affirming ALJ decision giving "little weight" to VA rating); *cf. Hacia v. Comm'r of Soc. Sec.*, 601 F. App'x 783, 785-86 (11th Cir. 2015) (finding no requirement that an ALJ must make detailed findings in support of his conclusion that the relative disability standards differ where "the ALJ's decision reflects that he considered both standards, determined that the DOD's disability standard was lower than that of the Commissioner, and thus assigned limited weight to the

DOD's determination"); *but see e.g.*, *Pratts v. Comm'r of Soc. Sec.*, No. 13-CV-2372 FLW, 2015 WL 5139148, at *13-17 (D.N.J. Sept. 1, 2015), *but cf. Gross v. Comm'r*, Soc. Sec., No. CIV. WDQ-13-1274, 2014 WL 3672878, at *4 (D. Md. July 22, 2014) (discussion of child disability under SSA and VA regulations).

Moreover, the ALJ's decision to accord little weight to the VA rating was not solely based on Plaintiff's alleged errors.  As mentioned above, the ALJ also gave the additional valid reason for affording the 70 percent rating little weight, since the disability determination contradicted the VA's medical records.  (Tr. 547).  Such is sufficient to meet the substantial evidence requirement.  *See Davis v. Astrue*, No. 10CV1732 BEN NLS, 2011 WL 3740365, at *10 (S.D. Cal. July 29, 2011) report and recommendation adopted, No. 10-CV-01732 BEN NLS, 2011 WL 3741010 (S.D. Cal. Aug. 24, 2011) (affirming decision where ALJ reviewed the evidentiary basis for the VA's rating and considered evidence from non-examining doctors that was not available to the VA).

Finally, Plaintiff's VA disability rating does not support a finding that Plaintiff is unable to work given that he applied for TDIU and his claim was rejected.  (Tr. 404 (noting that Plaintiff was applying for TDIU); (Tr. 1044) (rating decision denying Plaintiff's TDIU claim).

The Court finds that the ALJ committed no error in according little weight to the VA rating of 70 percent for PTSD.  Even if the ALJ erred, such would be

harmless and a remand would not alter the outcome of the case. *See e.g.*, *Williams v. Barnhart*, 87 F. App'x 240, 243-44 (3d Cir. 2004); *Napoli v. Colvin*, No. 3:13-CV-01815, 2014 WL 2808603, at *11 at n.23 (M.D. Pa. June 20, 2014) (finding harmless error harmless error under the totality of the evidence); *Bivins ex rel. N.B. v. Astrue*, No. 5:11-CV-51 MSH, 2011 WL 5859954, at *5 (M.D. Ga. Nov. 22, 2011) ("Considering the totality of the medical evidence . . . . A remand to have the ALJ perfect the record as to this statement would serve no practical purpose, would not alter the ALJ's findings, and would be a waste of judicial and administrative resources").

### C. Step Three Non-Severe Impairments

Plaintiff argues that the ALJ erred in finding that his lumbosacral strain, chondromalacia patellae, anxiety disorder, and adjustment disorder were not severe impairments. Pl. Brief at 16-19.

At step two of the five-step sequential inquiry, the ALJ must determine whether the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). An impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities," *i.e.*, physical abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, or mental activities such as understanding,

carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b); 416.921(b).

A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of the claimant's age, education, or work experience.  *See Bowen*, 482 U.S. at 149-51.  The claimant has the burden of showing that an impairment is severe.  *Bowen*, 482 U.S. at 146 n. 5.  Moreover, objective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).

If a claimant has any severe impairment, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g), 416.920(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two and all impairments are considered at step four when setting the residual functional capacity.  *See* 20 C.F.R. §§ 404.1523, 416.923 and 404.1545(a)(2), § 416.945(a)(2); *Rutherford v. Barnhart*,

399 F.3d 546, 553 (3d Cir. 2005); *Shannon v. Astrue*, No. 4:11-CV-00289, 2012 WL 1205816, at *10-11 (M.D. Pa. Apr. 11, 2012); *Bell v. Colvin*, No. 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013).

Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the impairment. *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord, Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006). Where the ALJ finds that Plaintiff suffers from even one severe impairment, any failure on the ALJ's part to identify other conditions as severe or precisely name the severe impairment does not undermine the entire analysis, when ultimately the ALJ properly characterized the symptoms and functional limitations. *See e.g.*, *Lambert v. Astrue*, No. Civ. A. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009); *Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *Faircloth v. Colvin*, No. Civ.A.12–1824, 2013 WL 3354546, at *11 (W.D.Pa.2013), *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion that [Plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step"); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[T]he ALJ considered any

limitations posed by the [impairment] at Step 4 . . . any error that the ALJ made in failing to include the [impairment] at Step 2 was harmless").

With regards to the alleged lumbosacral strain and chondromalacia patellae, the ALJ explained that such conditions, although diagnosed at a point in time, did not meet the durational requirement of 42 U.S.C. § 423(d)(1)(A) and 20 C.F.R. § 404.1509 which require that the medically determinable impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." *Accord Cerrato v. Comm'r of Social Sec.*, 386 F.App'x 283, 285–86 (3d Cir.2010); 42 U.S.C. § 423(d)(1)(A). The ALJ explained that Dr. Santos noted that Plaintiff had no limitation of motion related to his lumbosacral strain or chondromalacia patellae, Dr. Tuwiner stated that all x-rays and CT scans of the low back have been negative, Dr. Sluder stated on March 1, 2010 that there are no focal, motor or sensory deficits, and Dr. Saluja, observed that an MRI of the lumbar spine in December 2011 was normal. (Tr. 543). Plaintiff neglects to address that the VA rating decision (that he argues is determinative) stated that there was "no evidence of chondromalacia patellae." (Tr. 1043-44). Plaintiff also neglects to address the medical opinion cited by the ALJ where Ms. Gartner and Dr. Santos concluded that there was "no objective evidence of any pathology/No evidence of chondromalacia patella" and that   (Tr. 411). Ms. Gartner and Dr. Santos concluded that Plaintiff

"limp[ed] in a physiologically inconsistent manner-strongly suspicious of malingering." (Tr. 411-412).

With regard to the alleged anxiety disorder and adjustment disorder, the ALJ gave weight to Dr. Verdeyen's October 2008 opinion that Plaintiff's PTSD is the only current mental disorder." (Tr. 316). The ALJ also noted Plaintiff's non-compliance with mental health treatment and Plaintiff's stability of mental health symptoms although not taking the medication or seeing a therapist for long periods of time. (Tr. 546).

Substantial evidence supports the ALJ's reliance on the expert medical opinions to determine that Plaintiff's alleged lumbosacral strain and chondromalacia patellae do not meet the durational requirements, and that Plaintiff's only severe mental impairment is PTSD. Nevertheless, even if the ALJ erred such finding is harmless given the totality of the objective evidence cited by the ALJ in support of the ultimate conclusion that Plaintiff's limitations were not severe.

### D. Weight Accorded to Medical Opinions

Plaintiff argues that the ALJ erred in according little weight to Dr. Yelinek's November 2009 opinion and greater weight to the opinions of non-examining agency physicians. Pl. Brief at 28-33.

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Weight accorded to a medical opinion depends on the degree to which the opinion is supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). The more an opinion presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled. *See id.* Likewise, the more consistent a physician's opinion is with the record as a whole, the more weight it should be afforded. *See id.* Medical opinions consisting largely of checked boxes absent of narrative citing to reasons and evidence to support findings are afforded less weight than opinions which include detailed narratives citing to objective medical evidence. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (explaining more weight is given to opinions that include objective medical evidence); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("[F]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *Knox v. Comm'r of Soc. Sec.*, 365 Fed.Appx. 363, 367-67 (2010) (finding that ALJ properly discounted treating physician's check-list opinion because its conclusions were not supported by objective narrative of any specificity.).

The ALJ discussed at length the medical evidence and provided adequate reasoning for the allocation of weight to the different medical opinions. (Tr. 543-47). On October 9, 2008, Dr. Verdeyen assessed Plaintiff with a GAF score of 60. (Tr. 316). On November 9, 2009, Dr. Yelinek assessed Plaintiff with a GAF score of 45. (Tr. 351). On January 13, 2010, Dr. Asghar assessed Plaintiff with a GAF score of 58. (Tr. 445). On October 1, 2010, Plaintiff sought follow-up treatment for PTSD and it was noted that he was last seen on January 14, 2010, and that his girlfriend reported that he took his medication irregularly. (Tr. 398). Dr. Asghar observed that Plaintiff's memory was intact, judgement was fair, and assessed Plaintiff with a GAF score of 58. (Tr. 399). On June 29, 2011, Plaintiff sought follow-up mental health treatment after a break in treatment since October 1, 2010. (Tr. 907). Dr. Asghar opined that Plaintiff was "psychiatrically stable" and assessed him with a GAF score or 58. (Tr. 908). On April 18, 2012, Dr. Rizvi assessed Plaintiff with a GAF score of 55. (Tr. 852). On October 9, 2012, Plaintiff was last seen on April 18, 2012 by Dr. Rizvi. (Tr. 835). Dr. Arastu assessed Plaintiff with a GAF score of 60. (Tr. 836).

The ALJ assigned great weight to the opinions of Dr. Verdeyen, Dr. Asghar, Dr. Arastu, and Dr. Rizvi, a treating psychiatrist, that assessed Plaintiff with GAF scores of 58 and above. (Tr. 547). The ALJ explained that the opinions were

supported by the record as a whole and are consistent with Dr. Yelinek's statement that the claimant has a goal-directed thought process.  (Tr. 547).

The ALJ assigned limited weight to Dr. Yelinek's opinion that Plaintiff had a GAF score of 45 as it was internally inconsistent with Dr. Yelinek's statement that Plaintiff had intact attention and concentration.  (Tr. 547).  The ALJ also assigned limited weight to Dr. Yelinek's November 2009 opinion that Plaintiff had marked restrictions as such was not supported by the record as a whole.  (Tr. 547). The ALJ noted:

> Dr. Yelinek noted that the claimant has a small group of friends with whom he associates. Dr. Asghar stated that the claimant has no suicidal ideation and that the claimant is not acutely psychotic or manic. Dr. Asghar also stated that the claimant has been taking his medications irregularly. Therefore, there is some question regarding the claimant's compliance in addressing his PTSD. The records from the Department of Veterans Affairs on May 2, 2014 reveal that the claimant's psychological medications were last filled in February 2013. Said records also reveal that the claimant's PTSD is stable. Furthermore, the claimant testified that he is not currently receiving any treatment for PTSD and that he cannot remember when he last received treatment.

(Tr. 546) (internal citations omitted).  As explained above, the evidence does not demonstrate that Plaintiff's has significantly impaired judgement or insight to the extent that would interfere with his ability to comply with the mental health treatment.  In addition to observations from several doctors that Plaintiff's symptoms have been stable despite his non-compliance with mental health treatment and long gaps in time between seeing his mental health providers, in

addition to the majority of doctors assessing Plaintiff with a higher GAF score than that given by Dr. Yelinek, substantial evidence supports the ALJ's allocation of little weight to Dr. Yelinek and more weight to most of the other doctors.

The ALJ assigned "great weight" to the Psychiatric Review Technique of Michael Suminski, Ph.D., a non-examining DDS psychologist who stated that there was insufficient evidence to support a finding On January 29, 2014, state-agency psychologist Dr. Suminski, opined that there was insufficient evidence to substantiate the presence of a mental impairment and noted that Plaintiff failed to cooperate and the evidence in the file was insufficient to evaluate the claim. (Tr. 638). While Dr. Suminski's opinion is not based on the entirety of the record and is sparse, it is important to reiterate Plaintiff's burden to cooperating and proving a disability. In light of the totality of medical evidence and opinion evidence, the Court finds that the weight according to Dr. Suminski's opinion was harmless error.

### E. Listing 12.06

Plaintiff argues that he meets the criteria for an Anxiety Disorder under Listing 12.06. Pl. Brief at 19-23.

A claimant must establish each element of a Listing to meet a Listing. 20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies *all of the criteria in the*

*listing*.") (emphasis added). As the Third Circuit has explained:

> For a claimant to show that his impairment matches a listing, it must
> meet *all* of the specified medical criteria. An impairment that
> manifests only some of those criteria, no matter how severely, does
> not qualify." *Zebley*, 110 S.Ct. at 891 (emphasis in original). "For a
> claimant to qualify for benefits by showing that his unlisted
> impairment, or combination of impairments, is 'equivalent' to a listed
> impairment, he must present medical findings equal in severity to *all*
> the criteria for the one most similar listed impairment." *Id.* (emphasis
> in original).

*Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). Thus, if there is one

element that is not satisfied, the ALJ will have substantial evidence to conclude

that a claimant does not meet a Listing.  *See Williams v. Sullivan*, 970 F.2d 1178,

1186.

Listing 1.04 requires:

> Anxiety Related Disorders: In these disorders anxiety is either the
> predominant disturbance or it is experienced if the individual attempts
> to master symptoms; for example, confronting the dreaded object or
> situation in a phobic disorder or resisting the obsessions or
> compulsions in obsessive compulsive disorders.
>
> The required level of severity for these disorders is met when the
> requirements in both A and B are satisfied, or when the requirements
> in both A and C are satisfied.
> A. Medically documented findings of at least one of the following:
>     1. Generalized persistent anxiety accompanied by three out of
> four of the following signs or symptoms:
>         a. Motor tension; or
>         b. Autonomic hyperactivity; or
>         c. Apprehensive expectation; or
>         d. Vigilance and scanning;
> or

    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

    4. Recurrent obsessions or compulsions which are a source of marked distress; or

    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.   Plaintiff does not argue that his alleged anxiety condition results in the "complete inability to function independently" outside of his home.   Pl. Brief at 19-23.   Essentially, Plaintiff's argument rests on the November 2009 medical opinion of Dr. Yelinek, at the complete exclusion of all other medical opinions to establish the criteria for subsection B.   As explained above, substantial evidence supports the ALJ allotting little weight to Dr. Yelinek's opinion that Plaintiff experienced marked psychological impairments.   As such, it was not error for the ALJ to not conclude that Plaintiff met the criteria for Listing 12.06.

## V. Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: January 25, 2016                    s/Gerald B. Cohn
_____
                               **GERALD B. COHN**
                    **UNITED STATES MAGISTRATE JUDGE**